No. 23-60132

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Thryv, Incorporated,

Petitioner/Cross-Respondent,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner.

On review from the National Labor Relations Board
Case Nos. 20-CA-250250 and 20-CA-251105

BRIEF OF INTERVENOR LOCAL 1269,
INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, AFL-CIO

Jonathan D. Newman
Lucas R. Aubrey
Jacob J. Demree
Sherman Dunn, P.C.
900 Seventh St., N.W., Suite 1000
Washington, D.C. 20001
(202) 785-9300

*Counsel for Intervenor Local 1269,
International Brotherhood of
Electrical Workers, AFL-CIO*

August 18, 2023

# CERTIFICATE OF INTERESTED PERSONS

No. 23-60132

THRYV, INCORPORATED,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Thryv, Incorporated**, Petitioner/Cross-Respondent

Parent company: Thryv Holdings, Inc.

Counsel for Petitioner: Seyfarth Shaw, LLP

> Arthur G. Telegen
>
> Robert A. Fisher
>
> Jason J. Silver

**National Labor Relations Board**, Respondent/Cross-Petitioner

Counsel for Respondent:

> Ruth E. Burdick
>
> Jill H. Coffman
>
> Kira Dellinger Vol
>
> Eric Weitz

**Local 1269, International Brotherhood of Electrical Workers, AFL-CIO**, Intervenor

Counsel for Intervenor: Sherman Dunn, P.C.

> Jonathan D. Newman
>
> Lucas R. Aubrey
>
> Jacob J. Demree

Local 45, International Brotherhood of Electrical Workers, AFL-CIO[1]

Discriminatees:

> Elizabeth Bill
>
> Donna Kinzler

---

[1]     Local 1269 merged with Local 45 in January 2022.

Guia Rognerud

Roger Sherman

Jeremy Thomson

Rebecca Weiss

s/ Lucas R. Aubrey
Lucas R. Aubrey
*Counsel for Intervenor*

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns routine applications of 29 U.S.C. §§ 158(a)(1), 158(a)(5), and 160(c) by the National Labor Relations Board.  The Board found that Petitioner Thryv, Inc. violated the National Labor Relations Act by unilaterally laying off six employees and withholding information from their union.  The Board awarded make-whole remedies for all direct or foreseeable pecuniary harms, and left the specifics to be awarded to the compliance phase of the proceeding.  Neither the relevant law nor the facts of this case are so complicated as to require oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................. i

Statement Regarding Oral Argument ....................................... iv

Table of Authorities........................................................... vii

Statement of the Issues........................................................ 1

Statement of the Case ......................................................... 1

    I.    Factual Background ...................................................... 2

        A.    Thryv's Plan to Unilaterally Lay Off All Northern California NBAs .................................................. 3

        B.    Bargaining Sessions and Information Requests .......... 6

    II.    Procedural Background.............................................. 9

Summary of Argument.................................................... 16

Standard of Review ........................................................ 19

Argument.................................................................... 19

    I.    Thryv Violated Sections 8(a)(1) and (5) of the Act. ............. 19

        A.    Failure to Provide Information.................................. 19

        B.    Unilateral Layoffs ................................................ 23

    II.    Compensation for Direct or Foreseeable Pecuniary Harms Is Well Within the Board's Broad, Discretionary Remedial Powers............................................... 28

        A.    The Specific Remedy for the Laid-Off Employees Is Not Before This Court............................................ 28

B.      This Court Defers to the Board's Discretionary Remedial Authority......................................................30

C.      Section 10(c) Requires the Board to Award Make-Whole Relief Like the Remedy Ordered Here. ............32

        1.      Section 10(c) Broadly Authorizes Make-Whole Remedies. ................................................32

        2.      Compensation for Direct or Foreseeable Pecuniary Harms Makes Employees Whole After Unfair Labor Practices. .............................37

        3.      Compensation for Direct or Foreseeable Pecuniary Harms Is Not Consequential Damages. ..........................................................40

        4.      The Potential Remedies Discussed by the Board Fit Comfortably Within the Board's Remedial Authority...........................................43

Conclusion .......................................................................46

Certificate of Service .........................................................

Certificate of Compliance ..................................................

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Alcoa, Inc. v. NLRB,*
    849 F.3d 250 (5th Cir. 2017) ................................................. 19, 31, 44

*Ampersand Publishing, LLC,*
    370 N.L.R.B. No. 119, slip op. (Apr. 29, 2021),
    *enforced,* 43 F.4th 1233 (9th Cir. 2022) .................................. 39, 40

*Baker Mfg. Co.,*
    269 N.L.R.B. 794 (1984),
    *enforced in part,* 759 F.2d 1219 (5th Cir. 1985)...................... 39, 42

*Baker Mfg. Co. v. NLRB,*
    759 F.2d 1219 (5th Cir. 1985) ....................................................... 29

*BRC Injected Rubber Prods., Inc.,*
    311 N.L.R.B. 66 (1993) ................................................................. 37

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ...................................................................... 34

*Cordúa Rests., Inc. v. NLRB,*
    985 F.3d 415 (5th Cir. 2021) ........................................................ 19

*El Paso Elec. Co. v. NLRB,*
    681 F.3d 651 (5th Cir. 2012) ................................................... 21, 28

*Frontier Commc'ns Corp.,*
    370 N.L.R.B. No. 131 (May 26, 2021),
    *enforced per curiam,* No. 21-1892, 2022 U.S. App. LEXIS
    33668 (4th Cir. Dec. 7, 2022)........................................................ 22

*Gulf States Mfg., Inc. v. NLRB,*
    704 F.2d 1390 (5th Cir. 1983) ................................................. 25, 26

*Hadley v. Baxendale*
    [1854] EWHC (Exch) J70, 156 ER 145 ................................... 40, 41

*Hector Martinez & Co. v. S. Pac. Transp. Co.*,
    606 F.2d 106 (5th Cir. 1979) ........................................ 41

*Int'l Brotherhood of Teamsters v. United States*,
    431 U.S. 324 (1977) ..................................................... 36

*Jab Energy Sols. II, LLC v. Servicio Marina Superior, LLC*,
    640 F. App'x 373 (5th Cir. 2016) (per curiam) ........................ 41, 42

*King Soopers, Inc.*,
    364 N.L.R.B. 1153 (2016),
    *enforced in part*, 859 F.3d 23 (D.C. Cir. 2017) .................. 39, 42, 45

*King Soopers, Inc. v. NLRB*,
    859 F.3d 23 (D.C. Cir. 2017) ........................................ 45

*Kingsbury, Inc.*,
    355 N.L.R.B. 1195 (2010) ............................................ 27

*Martin Marietta Energy Sys., Inc.*,
    316 N.L.R.B. 868 (1995) ............................................. 22

*Mid-South Bottling Co. v. NLRB*,
    876 F.2d 458 (5th Cir. 1989) ..................................... 32, 34

*Napleton 1050, Inc.*,
    367 N.L.R.B. No. 6, slip op. (Sept. 28, 2018),
    *enforced*, 976 F.3d 30 (D.C. Cir. 2020) ......................... 37, 38

*Nat'l Hisp. Circus, Inc. v. Rex Trucking, Inc.*,
    414 F.3d 546 (5th Cir. 2005) .................................. 41, 42, 43

*New Assocs.*,
    307 N.L.R.B. 1131 (1992) ........................................... 24

*NLRB v. Citizens Hotel Co.*,
    326 F.2d 501 (5th Cir. 1964) ...................................... 25

*NLRB v. Gissel Packing Co.*,
    395 U.S. 575 (1969) ................................................. 31

*NLRB v. Gullett Gin Co.,*
    340 U.S. 361 (1951) ...................................................................... 32

*NLRB v. J.H. Rutter-Rex Mfg. Co.,*
    396 U.S. 258 (1969) .............................................................. 34, 37

*NLRB v. Laredo Packing Co.,*
    730 F.2d 405 (5th Cir. 1984) (per curiam) ..................................... 32

*NLRB v. Lighthouse for the Blind of Hous.,*
    696 F.2d 399 (5th Cir. 1983) ........................................................ 32

*NLRB v. LIUNA,*
    748 F.2d 1001 (5th Cir. 1984) ...................................................... 38

*NLRB v. Miami Coca-Cola Bottling Co.,*
    360 F.2d 569 (5th Cir. 1966) ........................................................ 38

*NLRB v. Motorola, Inc.,*
    991 F.2d 278 (5th Cir. 1993) ............................................. 19, 31, 44

*NLRB v. Seaport Printing & Ad Specialties, Inc.,*
    589 F.3d 812 (5th Cir. 2009) ........................................................ 25

*Nortech Waste,*
    336 N.L.R.B. 554 (2001) ............................................................... 38

*Phelps Dodge Corp. v. NLRB,*
    313 U.S. 177 (1941) .............................................................. 31, 33

*Pollard v. E.I. du Pont de Nemours & Co.,*
    532 U.S. 843 (2001) ..................................................................... 36

*Raven Servs. Corp. v. NLRB,*
    315 F.3d 499 (5th Cir. 2002) ............................................. 23, 24, 27

*Republic Steel Corp. v. NLRB,*
    311 U.S. 7 (1940) ........................................................................ 35

*Sara Lee Bakery Grp., Inc. v. NLRB,*
514 F.3d 422 (5th Cir. 2008) ........................................................ 20

*Shepard v. NLRB,*
459 U.S. 344 (1983) ....................................................................... 30

*Starnes v. Wallace,*
849 F.3d 627 (5th Cir. 2017) ........................................................ 33

*Sure-Tan, Inc. v. NLRB,*
467 U.S. 883 (1984) ....................................................................... 46

*Tesla, Inc. v. NLRB,*
63 F.4th 981 (5th Cir. 2023) (per curiam),
*reh'g granted*, 2023 U.S. App. LEXIS 18649 (5th Cir. July 21,
2023) ................................................................................................ 31

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951) ....................................................................... 19

*Va. Elec. & Power Co. v. NLRB,*
319 U.S. 533 (1943) ........................................................ 32, 34, 43

*Valmont Indus., Inc. v. NLRB,*
244 F.3d 454 (5th Cir. 2001) ........................................................ 19

*Voorhees Care & Rehabilitation Center,*
371 N.L.R.B. No. 22, slip op. (Aug. 25, 2021) ......................... 38, 39

*Wells v. Gen. Motors Corp.,*
881 F.2d 166 (5th Cir. 1989) ........................................................ 25

## Statutes

29 U.S.C. § 151 .............................................................................. 34

29 U.S.C. § 157 .............................................................................. 45

29 U.S.C. § 158(a)(1)................................................................. *passim*

29 U.S.C. § 158(a)(5)........................................................................ *passim*

29 U.S.C. § 160(c) ........................................................................... *passim*

29 U.S.C. § 160(e) ........................................................................ 19, 26

42 U.S.C. § 1981a(b) ........................................................................... 36

42 U.S.C. § 2000e-5(g)(1)................................................................... 36

**Other Authorities**

29 C.F.R. § 101.13(a) ....................................................................... 29

29 C.F.R. § 102.46(a)(1)(ii) .............................................................. 26

29 C.F.R. § 102.48(b) ....................................................................... 11

29 C.F.R. § 102.52 ............................................................................ 29

29 C.F.R. § 102.54(a) ....................................................................... 30

11 Corbin on Contracts § 56.6 (2023).............................................. 40

Antonin Scalia & Bryan A. Garner, *Reading Law: The
     Interpretation of Legal Texts* (2012)............................................. 33

*Foreseeable Damages, Black's Law Dictionary* (11th ed. 2019) ............ 38

## STATEMENT OF THE ISSUES

**I.** Does substantial evidence support the National Labor Relations Board's ("NLRB" or "Board") conclusion that Thryv, Inc. ("Thryv") violated Sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (5), by refusing to provide International Brotherhood of Electrical Workers, Local Union 1269 ("Local 1269") with relevant information and by unilaterally laying off six employees without first bargaining to impasse with Local 1269?

**II.** Is the Board's order directing Thryv to make the laid-off employees whole by paying compensation for all direct or foreseeable pecuniary harms flowing from the unlawful layoff authorized under a reasonably defensible reading of the Act?

## STATEMENT OF THE CASE

Local 1269 adopts and incorporates herein the statement of the case and arguments set forth in the brief of the National Labor Relations Board. Local 1269 submits this brief to highlight certain arguments on the merits and to explain thoroughly why the Board's remedial order should be affirmed.

## I.    Factual Background

Thryv is the current successor in a line of marketing agencies selling Yellow Pages advertising. ROA.47:8-48:21, 3080. Local 1269 has represented a unit of Thryv's outside sales force employees in Northern California and Nevada that had existed since the mid-1960s. ROA.3138. "Outside," or "premise," sales employees visit clients to solicit advertisements. ROA.62:10-12, 3080. There are three categories of outside sales employees: Senior Business Advisors ("SBAs"), Business Advisors ("BAs"), and New Business Advisors ("NBAs"). ROA.556:19-21, 3080. SBAs sell to high-value clients, BAs sell to medium-value clients, and NBAs solicit new clients. ROA.60:3-23, 3080. NBAs – the employees relevant here – receive commissions on their sales and retain a book of business from year to year. ROA.732:14-18.

In or around August 2016, Local 1269 and Thryv started bargaining for a successor collective bargaining agreement covering the outside sales force unit. ROA.53:11-15. Bargaining continued for several years. Thryv (then Dex Media, Inc.) submitted a "Last, Best, and Final Offer" ("LBFO") in August 2018. ROA.3260. That offer included substantive changes to wages (ROA.3276-86), hours (ROA.3274), overtime (ROA.3288-89),

layoffs (ROA.3305-06), and other terms and conditions of work. The Union opposed the LBFO. ROA.817:25-818:2. The next month, Thryv declared impasse and unilaterally implemented its LBFO. ROA.794:16-17, 3081 n.5.

Local 1269 and Thryv resumed bargaining in early 2019. *See* ROA.794:16-17 (testimony that Local 1269 and Thryv bargained after Thryv declared impasse); 1461-62 (emails regarding bargaining on February 7, 2019); *see also* ROA.3672-73 (emails dated July 13, 2019 and August 1, 2019 asking Thryv to continue bargaining over the collective bargaining agreement). In March 2019, Thryv appointed Labor Relations Manager Ralph Vitales as its representative in the negotiations over a successor agreement. ROA.1245. After it had resumed bargaining and before reaching agreement, Thryv refused to provide Local 1269 with requested information and laid off six employees. ROA.3082.

## A. *Thryv's Plan to Unilaterally Lay Off All Northern California NBAs*

Between July 15 and 18, 2019, Thryv management exchanged emails discussing a plan to lay off the Northern California NBAs (sometimes referred to as Digital Sales Executives ("DSEs")). ROA.3683-

93.  Vice President of Human Resources Lisa O'Toole noted that laying off the NBAs "[w]ould be extremely beneficial" to Thryv.  ROA.3687.  The "immediate reduction in headcount for the region" would "save $170k for the last four months of 2019" (though it would also cost "roughly $150k in severance" payments).  ROA.3685.  Thryv recognized that the layoffs, however, would be "no small thing."  ROA.3687.  Thryv wanted to "keep the good ones" while still "call[ing] it a channel elimination."  ROA.3683; *see* ROA.3080.  But Thryv recognized that there were obstacles to its plan, "labor negotiations being the most significant."  ROA.3687.

Thryv's plan was to transfer "those that we want/need to keep" into BA positions, which would make it easier to eliminate the entire NBA "channel," or job classification.  ROA.3683.  Thryv had already transferred Marlon McConner from an NBA to a BA position.  ROA.3723. On July 21, 2019, Thryv transferred Luis Pantoja from an NBA position to a BA position.  ROA.3717.

On August 21, 2019, Thryv Assistant Vice President of Labor Relations Elizabeth Dickson emailed Local 1269 Business Manager/Financial Secretary Karen Gowdy and announced that six NBAs "will be eliminated."  ROA.3756.  The email stated that "Thryv *will*

4

*administer* a force adjustment" on September 20, 2019, and it listed the six employees to be laid off. *Id.* (emphasis added); *see* ROA.3081. Local 1269 responded the next day "to schedule bargaining." ROA.3758; *see* ROA.3081. The union's earliest availability was September 11 and 12. ROA.3081, 3768, 3834.

Before any bargaining began, however, on September 5, Thryv Labor Relations Manager Vitales told Local 1269 that Thryv would inform the NBAs of the layoffs the next day – on September 6 – just five days before bargaining was set to begin, and on a day Thryv thought the union would not be available. *See* ROA.3081, 3766, 3834. At the September 6 meeting with the NBAs, Thryv Regional Vice President Terry Henshaw announced that the NBAs' "positions *will be eliminated* effective September 20, 2019." ROA.3081, 3833 (emphasis added). Thryv sent severance packages to each of the laid-off NBAs that weekend. ROA.3081, 3771-3831. Vitales invited the union to "bargain *the effect* of this force reduction" when they met on September 11. ROA.3766 (emphasis added); *see* ROA.3081.

## B.    *Bargaining Sessions and Information Requests*

Six days after Thryv announced its layoff decision to the employees, the parties met for their first scheduled bargaining session.  ROA.3081. Local 1269 President Stefen Guthrie asked Vitales for a proposal regarding the layoffs.  Vitales replied that the situation was covered by Article 30 of the LBFO.  ROA.3081, 3841, 3880.

Article 30 of Thryv's LBFO provided that if Thryv determined that a layoff was necessary, it had to provide Local 1269 at least "thirty (30) calendar days' notice of its intended plan."  ROA.3305.  Under Article 30, that plan may only be implemented after notice and discussion with Local 1269.  *Id.*  Thryv must offer laid-off employees new jobs "if qualified" and "if there are any openings that the Company determines are to be filled." ROA.3306.  Guthrie asked for a list of open jobs, but Vitales replied that the laid-off NBAs could apply for any openings that arose.  ROA.3081, 3866, 3889.   To evaluate the NBAs' "[c]lient base," ROA.3081, 3862, Guthrie also requested an "audit trail" for all NBA accounts, *i.e.*, a list of "assignments, customer names, locations, addresses, records, advertising revenue, commissions, items of advertising, and a listing of the sales representative of record."  ROA.3081; *see* ROA.3858-59, 3888.

6

Further, Guthrie requested the work market locations of the six laid-off NBAs. ROA.3081, 3889. At a later meeting, Vitales shared the cities where the NBAs worked, ROA.3987, 4021, but Local 1269 requested more specific information, ROA.3990. Local 1269 had last received information about the NBAs' locations over a year prior. ROA.384:10-24. It needed the information again to determine "the specifics, not just the area location, but how many employees were also segmented into those particular locations so that [Local 1269] could, once [it] got the market, evaluate" what market the terminated employees had and "where it went." ROA.187:23-188:2.

During the September 11 meeting, Local 1269 proposed that Thryv absorb the NBAs into the BA channel. ROA.3081, 3861-62, 3890. Thryv claimed it would be too expensive to do so. ROA.3081, 3862, 3890. Guthrie then recommended suspending the layoffs until the parties could intelligently bargain, but Vitales replied, "[w]e can discuss [it] now, the company's not going to recend [sic] the force adjustments." ROA.3890; *see* ROA.3081, 3862. The next day, Guthrie again proposed integrating the NBAs into new positions, but Dickson replied, "[t]he company is eliminating the 6 people in the channel" because "[t]he channel is not

performing. Their numbers are low." ROA.3908; *see* ROA.3081. Guthrie countered, "[t]he company had information and we didn't have a meeting to see how we could absorb these people into the BA role. We have not had the benefit of this information. . . . We really have a problem." ROA.3908; *see* ROA.3081.

Thryv laid off the six NBAs on September 20. ROA.3082. On October 3, Local 1269 and Thryv met for another bargaining session, during which Guthrie explained that the union's pre-layoff information requests were necessary to evaluate the market assigned to the NBAs and determine whether the laid-off employees could take any share of that market. ROA.3082, 4010-11, 4029. Over the rest of October, Local 1269 also requested information on "twin accounts" created after two previous business entities merged to form Thryv, Inc., ROA.3082, 4132; account and market information for NBAs, BAs, and SBAs in the Northern California and Nevada market, ROA.3082, 4178-79; and market and employee transfers, ROA.3082, 4179.

The parties' last bargaining session over the layoffs was on October 31. Guthrie began, "I don't know how to bargain if we have RFI [requests for information] and we need the information to bargain." ROA.3082,

4206. Vitales claimed that the October requests were "voluminous" and would require "multiple departments" and "man hours" to respond to. ROA.4206, 4216, 4218. Guthrie replied that Local 1269 would accept raw data to lessen the load and that it would consider any cost sharing proposals. ROA.4206, 4218. Despite Local 1269's repeated requests, *see* ROA.3081-82, Thryv has never produced the desired materials.

## II.    Procedural Background

**A.** Local 1269 filed unfair labor practice charges against Thryv in October and November 2019. ROA.1020, 1027. The NLRB General Counsel consolidated the cases and issued a complaint in February 2020 that alleged Thryv violated Sections 8(a)(1) and (5) by unilaterally laying off employees without first bargaining to impasse and by failing to respond to Local 1269's requests for information. ROA.1001-11.

After a six-day hearing in September and October 2020, ROA.2619, Administrative Law Judge John T. Giannopoulos found that Thryv engaged in unfair labor practices by refusing to provide the union with information "relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of its employees." ROA.2670. The information requests concerning bargaining-unit

9

employees were "presumptively relevant," and the requests involving non-unit employees were relevant because they related to transfers of work outside the bargaining unit. ROA.2647, 2655-56, 2660. The requests were not unduly burdensome or made in bad faith, so Thryv had a duty to comply. ROA.2656-57, 2661-62.[2]

Judge Giannopoulos dismissed, however, the complaint's allegation that the layoffs were unlawful. ROA.2669. He found that Thryv "met its obligation to bargain" because "the Union failed to present any reasoned proposals before September 20," so either impasse occurred or Local 1269 waived its opportunity to bargain. ROA.2666. In the ALJ's view, Thryv did not present the layoffs as a *fait accompli* because it provided Local 1269 with opportunities to meet and discuss the layoff plan. ROA.2667.

In reaching these conclusions, the ALJ credited the parties' bargaining notes and discredited any testimony that conflicted with those notes or his findings. ROA.2619 n.5, 2629 n.22. The ALJ also

---

[2]     The ALJ also determined that Local 1269 was entitled to certain additional information about quarterly relief (ROA.2649), twin accounts (ROA.2665), and the market and account assignments of Pantoja and McConner (ROA.2657). Plus, the ALJ dismissed several allegations relating to information requests about Pantoja and McConner. ROA.2652, 2654. The Board affirmed these conclusions in the absence of exceptions by the parties. ROA.3080 n.1.

discredited testimony that the union representatives "did not know the locations of the six NBAs." ROA.2669 n.41.

Local 1269 (ROA.2680), the General Counsel (ROA.2679), and Thryv (ROA.2704-05) filed exceptions to the ALJ's determinations, which brought the case before the Board. *See* 29 C.F.R. § 102.48(b).

**B.** The Board did not claim to reverse any of the ALJ's credibility determinations. It adopted the ALJ's information-request conclusions because "[t]he judge carefully explained how each item of information requested by the Union was presumptively relevant . . . or how the Union demonstrated the relevance of such information as necessary to its role of bargaining representative. The judge correctly rejected the Respondent's claims that the provision of the requested information would be burdensome, voluminous, costly, or confidential." ROA.3082. Therefore, the Board ordered Thryv to provide the requested information. ROA.3094.

But the Board reversed the ALJ's unilateral-layoff conclusion, finding that "the Respondent's decision to lay off the six New Business Advisors was presented as a *fait accompli*"; Thryv's "failure to provide the requested information prevented [Local 1269] from making reasoned

counterproposals," which precluded impasse; and the layoffs were implemented prior to the parties reaching overall impasse. ROA.3083.

The Board emphasized that, "weeks before the Respondent first informed the Union of the layoff decision on August 21," Thryv "began taking steps to implement its layoff decision" by transferring Pantoja and McConner from their positions as NBAs into BA positions. ROA.3083. Thryv then informed employees of its layoff decision five days before bargaining with Local 1269. *Id.* Thryv did not "cure" its unlawful conduct through subsequent bargaining or by seeking counterproposals: Thryv's failure to provide relevant and necessary information to the union – the audit trail and market location of NBAs – "precluded the Union from formulating substantive counterproposals." *Id.* Contrary to the ALJ, the Board found that the audit trail request was for the purpose of bargaining over the layoffs (specifically, to determine what accounts were available to give to the laid-off employees in new or restored positions). ROA.3084. The market location request was relevant to determine base pay and the accounts available to the employees if they were transferred to BA positions. *Id.*

The Board further found "that the Respondent violated its duty to refrain from making unilateral changes during the pendency of bargaining a successor agreement" without reaching overall impasse. ROA.3084. Here, the parties "were in the process of negotiating a new collective-bargaining agreement when the Respondent implemented the unilateral layoffs on September 20. The parties subsequently reached agreement on November 14." *Id.* Because Local 1269 did not engage in bargaining delay tactics and because Thryv did not face economic exigencies that would require quick action, Thryv violated Sections 8(a)(1) and (5) by implementing unilateral layoffs during negotiations over a successor agreement prior to bargaining to an overall impasse. ROA.3085.[3]

Thryv moved for reconsideration, claiming among other things that overall impasse had been reached because it had earlier declared impasse and implemented its LBFO. ROA.4279. Thryv also contended that the Board "was led astray by not considering Article 30 of the LBFO as the

---

[3]    Members Kaplan and Ring concurred in the Board's merit findings, and thus the Board was unanimous in holding that Thryv violated the Act by failing to bargain to impasse before laying off the employees, and in refusing to provide Local 1269 with the information it had requested. ROA.3096.

context for what happened in the layoff bargaining." ROA.4280. The Board denied the motion. ROA.4286.

With respect to Thryv's contention that it had lawfully implemented the LBFO in 2018, the Board found that issue "was not before the Board in the underlying proceeding. Instead, the Board considered whether, in September 2019 [when the layoffs occurred], the parties were at a valid impasse when the Respondent unilaterally laid off six unit employees in the midst of negotiations for a successor agreement . . . ." ROA.4286 n.1. Regardless, the prior dismissal of the charge based on the unilateral implementation of the LBFO did not have res judicata effect, and Thryv never gave the union an opportunity to bargain the layoff decision. ROA.4287-88 n.1. The Board rejected the assertion that the LBFO excused Thryv from its obligation to bargain with the union over the layoffs. ROA.4287 n.1. The Board stated that any impasse that may have existed when the LBFO was implemented had been broken when the parties resumed bargaining a successor agreement. *Id.* Further, the Board recognized that even if it was assumed *arguendo* that the LBFO was lawfully implemented, Thryv did not assert that Article 30 of the LBFO may be read to waive Local 1269's right to bargain over

any decision to lay off employees. *Id.* And finally, the Board held that the unilaterally implemented LBFO did not excuse Thryv from bargaining over the decision to lay off the NBAs. *Id.*[4]

**C.** After finding that Thryv violated Sections 8(a)(1) and (5) of the Act when it laid off the six NBAs, the Board directed Thryv to reinstate the employees, pay backpay, and compensate the six laid-off NBAs for any "direct or foreseeable pecuniary harms incurred as a result of the unlawful layoff, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings." ROA.3093. The Board left calculating the amount of backpay and types of direct or foreseeable pecuniary harms to be awarded to the Board's compliance procedures but observed that direct or foreseeable pecuniary harms in this case might include loss of the NBAs' books of business, the costs of maintaining a vehicle for use on company business, and out-of-pocket medical expenses incurred by an NBA who was laid off while on disability leave for a high-risk pregnancy. *Id.* All five Board members agreed that the Board's make-whole

---

[4]    Member Kaplan concurred with the Board's denial of Thryv's motion for reconsideration because Thryv failed to identify any material error or show extraordinary circumstances warranting reconsideration. ROA.4288 n.2.

authority includes compensation for direct and indirect harms, ROA.3095, and that awarding remedies "is highly fact-dependent" and must be done "on a case-by-case basis" "at the compliance stage of this proceeding," ROA.3095-96.[5]

On March 20, 2023, Thryv filed a petition to review the Board's order, and the Board filed a cross-application for enforcement on March 30, 2023. The Court granted Local 1269's motion to intervene on May 26, 2023.

## SUMMARY OF ARGUMENT

**I.** Substantial evidence supports the Board's conclusion that Thryv violated Sections 8(a)(1) and (5) of the Act by refusing to provide information relevant to Local 1269's representation of Thryv's employees. And Thryv's refusal to supply the requested information precluded impasse, thus precluding the unilateral layoff of the six employees. Thryv's assertion that Local 1269 did not demand bargaining over the layoffs is wrong and, moreover, completely misplaced because Thryv

---

[5]    Members Kaplan and Ring dissented in part because they disagreed with the majority that the Board should invariably order respondents in unfair labor practice cases to compensate employees for foreseeable pecuniary harm. But they agreed that employees may be made whole for losses where "the causal link between the loss and unfair labor practice is sufficiently clear." ROA.3095.

presented the layoffs as a *fait accompli*.  Further, Thryv's previous unilaterally implemented LBFO is not relevant.  Even if Thryv had reached impasse earlier when it implemented its LBFO, that impasse had been broken when the parties resumed bargaining.  To the extent that Thryv is asserting that its implementation of the LBFO excused its failure to bargain over the layoffs, the Court is precluded from considering that argument since it was not made below, and regardless, that argument is it at odds with this Court's precedent.

**II.**  The specific remedies to be awarded the six unlawfully laid off NBAs have not yet been determined.  Instead, those issues will be determined by the Board in the compliance phase of the proceedings.  Thus, although the Board indicated that a remedy that includes the restoration of the NBAs' book of business, compensation for the NBAs' lost car allowance, and out-of-pocket medical expenses incurred by an NBA who was laid off while on disability leave due to high-risk pregnancy may be appropriate in this case, the Board "reserve[d] these remedial issues for resolution in the compliance stage of the proceedings." ROA.3093.  Therefore, any specific remedy to be ordered in this case has not yet been presented to this Court for review.  Thryv will have the

opportunity to litigate remedial issues in the compliance phase, and thereafter, if necessary, seek review in this Court.

Here, Thryv takes issue with the Board's generic make-whole remedial order. Section 10(c) of the Act broadly authorizes make-whole remedies that restore the status quo from before the unfair labor practice. The key word in the text is "including," which indicates that reinstatement and backpay are only examples of a broad range of "affirmative actions" the Board may award. "Including" does not limit the scope of awards available to some narrow set of "traditional remedies."

Compensation for direct or foreseeable pecuniary harm is well within the Board's authority to award make-whole relief. Loss of job and income – remedied by reinstatement and backpay – are far from the only economic harms caused by unfair labor practices. Compensation for direct or foreseeable pecuniary harm restores the economic status quo of employees and is not consequential damages. Thryv's arguments to the contrary are unavailing.

## STANDARD OF REVIEW

The Court defers to the Board's findings of fact and applications of law to fact that are "supported by substantial evidence on the record considered as a whole." *Cordúa Rests., Inc. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021) (quoting 29 U.S.C. § 160(e)). The Court reviews questions of law de novo, and enforces Board orders as long as "the Board's construction of the statute is 'reasonably defensible.'" *Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (quoting *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993)). As long as "a reasonable mind" could accept the Board's findings of fact and applications of law to fact, the Board's decision must be enforced – even if a court would have decided the case differently. *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

## ARGUMENT

## I.    Thryv Violated Sections 8(a)(1) and (5) of the Act.

### A.    *Failure to Provide Information*

The Board correctly affirmed the ALJ's holding that Thryv violated the Act by failing and refusing to respond to Local 1269's requests for information. ROA.3082. The information requested by Local 1269 bore

"a logical relationship" to "legitimate union purpose[s]." *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 431 (5th Cir. 2008).

The requests for an audit trail and information on work market locations, Northern California and Nevada markets, twin accounts, and work transfers sought information about work assigned to unit employees, and therefore, those requests are "presumptively relevant." *Sara Lee Bakery Grp.*, 514 F.3d at 430. Moreover, Local 1269 requested the audit trails to evaluate the NBAs' "[c]lient base." ROA.3081, 3862. And Local 1269 requested the market locations to "determine the base pay of the New Business Advisors, as well as what accounts might be available to them in that market were they to be transferred to Business Advisor positions." ROA.3084. The audit-trail and market-location requests were thus relevant and necessary to Local 1269's bargaining over the layoffs.

Thryv failed to show that the information would be "burdensome, voluminous, costly, or confidential" to produce. ROA.3082. Therefore, the Board's determination that Thryv violated the Act by failing to supply

the requested information is supported by substantial evidence and should be enforced.[6]

Thryv makes three challenges to the Board's conclusion. First, Thryv claims that it already provided Local 1269 with the locations of the six NBAs. Thryv Br. 48. That's true. *See* ROA.384:10-24. But "it was not unreasonable for [Local 1269] to seek to *confirm* the accuracy of whatever information they had previously received regarding the six NBAs" since "over a year had passed since this information had been provided to the Union." ROA.2656 (emphasis added). Local 1269 also requested "the specifics, not just the area location" of the NBAs, which Thryv failed to provide when it merely offered the NBAs' cities at the bargaining table. ROA.187:23-24.

Second, Thryv states that responding to the audit trail request would be burdensome. Thryv Br. 48. Thryv argues that Local 1269 made this request in bad faith, "precisely" to impose a burden on Thryv. *Id.* But Thryv points to no evidence in the record showing that Local 1269

---

[6]    Thryv does not contest the Board's findings that Thryv unlawfully failed to respond to requests for information about quarterly relief, twin accounts, and the market and account assignments of Pantoja and McConner. ROA.3080 n.1. The Court must enforce the Board's order with respect to those issues. *See El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 658 (5th Cir. 2012).

intended to burden Thryv by requesting the audit trails. Instead, Thryv apparently relies on Vitales' testimony that creating an audit trail is "a manual process" that "take[s] time," ROA.705:11-12, *see* Thryv Br. 48; however, the ALJ correctly held that Thryv could not rely on that testimony to establish an undue burden because it failed to raise that concern at the bargaining table. ROA.2656-57; *see Frontier Commc'ns Corp.*, 370 N.L.R.B. No. 131, slip op. at 1 n.2 (May 26, 2021), *enforced per curiam*, No. 21-1892, 2022 U.S. App. LEXIS 33668 (4th Cir. Dec. 7, 2022).

Finally, Thryv claims that Local 1269 refused to cooperate with Thryv in responding to its October 17 requests, the costs of which Thryv claims were disproportional to Local 1269's needs. Thryv Br. 48-49. The ALJ, however, found that Thryv failed to show how producing the information would be unduly burdensome or expensive. ROA.2661-62. Thryv does not point to any record evidence showing how those requests created an undue burden, yet that is precisely the respondent's burden in a failure-to-provide-information case. *See Martin Marietta Energy Sys., Inc.*, 316 N.L.R.B. 868, 868 (1995). Here, Local 1269 even made efforts to accommodate Thryv's concerns by accepting information in

another form or sharing the costs. ROA.4206, 4218. Thryv's arguments therefore lack merit.

## B.    *Unilateral Layoffs*

Thryv committed an unfair labor practice by unilaterally laying off the six NBAs without first bargaining to impasse. Thryv's own actions prevented a lawful impasse.

This Court's decision in *Raven Services Corp. v. NLRB*, 315 F.3d 499 (5th Cir. 2002) is instructive. In that case, following impasse, the employer unilaterally implemented a management rights clause giving it discretion to make changes, including the discretion to reclassify employees and lay them off. *Id.* at 501. Two years after the clause was implemented, the union requested relevant information and dates for new negotiations. The employer failed to supply any of the requested information, refused to bargain, and unilaterally reclassified employees within a lower wage category and laid off others. The Board held that the employer's unilateral actions violated the Act. *Id.* at 502.

This Court enforced the Board's decision and recognized that "[t]he issue" was "whether the parties were still at impasse" when the employer implemented the unilateral changes reclassifying and laying off the

employees. 315 F.3d at 504. The Court held that there were two reasons that the parties were not at impasse. First, circumstances had changed, making fruitful negotiations possible. *Id.* at 505. Second, "it is well settled that a failure to supply information relevant and necessary for bargaining constitutes a failure to bargain in good faith and precludes a finding of a genuine impasse." *Id.* (quoting *New Assocs.*, 307 N.L.R.B. 1131, 1135 (1992)). Here, because Thryv failed to supply Local 1269 with the requested relevant information, the parties could not have been at impasse when Thryv laid off the employees. Therefore, its unilateral decision to lay off the employees violated the Act.

Thryv implies that Local 1269 waived its right to bargain because it did not explicitly request to bargain over Thryv's decision to lay off the employees, and Thryv asserts that subsequent bargaining notes with the words "effects bargaining" evidence that waiver. Thryv Br. 26. First, the record shows that Local 1269 satisfied any obligation to demand bargaining. The day after Thryv informed Local 1269 of "the Company's plan" to lay off the NBAs, ROA.3756, Local 1269 emailed Thryv and stated: "Please consider this formal notification that the Union would like to schedule bargaining regarding the Company's notification of Force

Adjustment. Please reply with your availability." ROA.3758. That is certainly a "clear and unequivocal demand for bargaining." *Wells v. Gen. Motors Corp.*, 881 F.2d 166, 170 n.6 (5th Cir. 1989).

Second, Thryv's presentation of its layoffs as a *fait accompli* from the start made it impossible for the union to bargain the decision, making any infirmities in the union's request irrelevant. *See NLRB v. Seaport Printing & Ad Specialties, Inc.*, 589 F.3d 812, 817 (5th Cir. 2009) ("[A] union cannot be held to have waived bargaining over a change that is presented to it as a *fait accompli*.") (quoting *Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390, 1397 (5th Cir. 1983)).

As this Court recognized in *NLRB v. Citizens Hotel Co.*, "there must be discussion prior to the time the change is initiated," and an employer must give the union "a reasonable opportunity for counter arguments or proposals." 326 F.2d 501, 505 (5th Cir. 1964). That means an employer violates the Act when it gives *no* notice before implementing unilateral changes, *e.g.*, *Seaport Printing*, 589 F.3d at 816, or when it gives no *reasonable* notice, *e.g.*, *Gulf States Mfg.*, 704 F.2d at 1397.

Thryv planned the layoffs and transferred Pantoja from his NBA position weeks before it informed the union of its layoff decision, and

then – five days before it sat down to bargain the layoffs – told employees that they would be laid off. ROA.3083. Local 1269 had no reasonable opportunity to bargain before the decision was implemented.

Thryv asserts that the LBFO privileged it to implement the layoffs without first bargaining to impasse with Local 1269 over the decision to layoff the NBAs. Thryv Br. 38 (asserting that Thryv "would not have violated the Act by following the status quo reflected in Article 30 of the LBFO"). Thryv's argument is misplaced for two reasons.

First, Thryv never excepted to the ALJ's finding that the LBFO did not excuse Thryv "from its bargaining obligation." ROA.2665-66. Thryv instead argued the opposite: "The Company's implemented LBFO permitted 30 days *to bargain over the layoff* . . . ." ROA.2698 (emphasis added). Because Thryv failed to argue before the Board that it was excused from its bargaining obligations, this Court may not now consider that argument. ROA.4287 n.1 "Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged will be deemed to have been waived." 29 C.F.R. § 102.46(a)(1)(ii); *see* 29 U.S.C. § 160(e); *Gulf States Mfg.*, 704 F.2d at 1396. Indeed, Thryv itself recognized that it was obligated to bargain over the layoffs with Local

1269.  ROA.3687 (noting that "there are obstacles" to the layoffs, with "labor negotiations being the most significant").

Second, even if Thryv's argument were before this Court – and it's not – this Court recognized in *Raven Services* that when a bargaining impasse does not exist or has been broken, an employer cannot rely on a previously implemented clause to assert that it had the ability to bypass the union and unilaterally implement changes.  In that case, this Court held that the employer "could not have validly made [unilateral changes] pursuant to [a] prior unilaterally implemented management rights clause" that purportedly gave the employer the discretion to make those changes.  315 F.3d at 506.

A contrary rule would make a mockery out of the bargaining process by allowing an employer to impose a sweeping management rights clause at impasse and then, after impasse had been broken, bypass the employee's bargaining representative and act pursuant to its imposed management rights clause.  *Cf. Kingsbury, Inc.*, 355 N.L.R.B. 1195, 1195 n.1 (2010) (An employer cannot enforce a unilaterally implemented provision to waive employees' rights under the Act.).  Thus, even if Thryv was not precluded from arguing that the unilaterally imposed Article 30

gave it the ability to lay off employees without bargaining with Local 1269, such an argument is without merit.

Therefore, Thryv violated Sections 8(a)(1) and (5) of the Act when it failed to provide Local 1269 with the requested information and laid off the six NBAs. To address the failure to provide information, the Board ordered Thryv to provide Local 1269 with the information requested. ROA.3094. And to remedy the unilateral layoffs, the Board ordered Thryv to bargain with the union, rescind the layoffs, reinstate the NBAs, make the employees whole, and compensate the employees for any adverse tax consequences of receiving lump-sum backpay awards. *Id.* Thryv challenges only the Board's award of compensation for direct or foreseeable pecuniary harms (a part of the make-whole remedy). Thryv Br. 2. Therefore, this Court must enforce the other awards if it enforces the Board's order. *See El Paso Elec. Co.*, 681 F.3d at 658.

## II.    Compensation for Direct or Foreseeable Pecuniary Harms Is Well Within the Board's Broad, Discretionary Remedial Powers.

### A.    *The Specific Remedy for the Laid-Off Employees Is Not Before This Court.*

"Consistent with [its] past practice in calculating other forms of make-whole relief," the Board "reserve[d]" remedial issues like the types

and amounts of compensation for direct or foreseeable pecuniary harms to be awarded "for resolution in the compliance stage of the proceedings, when the General Counsel and the Respondent will each have the chance to present evidence supporting their respective positions." ROA.3093. In fact, all five Board members agreed that make-whole relief for losses directly or indirectly caused by an unfair labor practice may be appropriate, depending on the facts of the case *and as determined during the compliance stage*. *See* ROA.3093 (majority op.), 3095-96 (Members Kaplan and Ring, concurring in part and dissenting in part). Therefore, the appropriateness of any type or amount of compensation for direct or foreseeable pecuniary harms to be awarded has not yet been determined.

At the compliance phase, Thryv "will be afforded a full opportunity to present its arguments to the Board and, if necessary, to seek review by this court." *Baker Mfg. Co. v. NLRB*, 759 F.2d 1219, 1223 (5th Cir. 1985). After the Board orders a remedy (as the Board did here), the regional office in which the charge was filed seeks the respondent's voluntary compliance. 29 C.F.R. §§ 101.13(a), 102.52. If informal talks fail, and the respondent refuses to comply with the region's compliance determinations, the regional director may issue a compliance

specification and move to a hearing before an administrative law judge. *Id.* § 102.54(a).  In any such hearing in this case, the General Counsel would have the burden of producing evidence to show the nature and amount of the direct or foreseeable harms to be remedied, and Thryv would have the opportunity to present evidence disputing the compliance specification.  ROA.3091.  Then, if Thryv disagrees with the Board's compliance order, it can petition for review in this Court.

## B.   This Court Defers to the Board's Discretionary Remedial Authority.

Thryv contends that the Board's order requiring Thryv to "[m]ake the affected employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of their unlawful layoff," ROA.3094, is contrary to the Act.  Thryv Br. 40-47.  Thryv's arguments misconstrue the nature of the order and are completely misplaced.

Section 10(c) of the Act requires the Board to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the Act.  29 U.S.C. § 160(c).  Thus, Congress gave the Board power to effectuate the policies of the Act by determining appropriate remedies.  *Shepard v. NLRB*, 459 U.S. 344, 349 (1983).  The

Supreme Court long ago recognized that Congress could not "define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941). "Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review." *Id.*

"[I]n light of its policy expertise and its broad, discretionary remedial powers," this Court gives "special respect" to the Board's choice of remedy. *Tesla, Inc. v. NLRB*, 63 F.4th 981, 996 (5th Cir. 2023) (per curiam), *reh'g granted on other grounds*, 2023 U.S. App. LEXIS 18649 (5th Cir. July 21, 2023). The Court enforces Board orders as long as "the Board's construction of the statute is 'reasonably defensible.'" *Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (quoting *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1993)).

When it chooses a remedy, the Board "draws on a fund of knowledge and expertise all its own." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969). The Board's choice of remedy must be upheld unless "the order is a patent attempt to achieve ends other than those which can

fairly be said to effectuate the policies of the Act." *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943). As such, this Court has described its review of Board choices of remedy as "quite limited," *Mid-South Bottling Co. v. NLRB*, 876 F.2d 458, 460 (5th Cir. 1989) (quoting *NLRB v. Lighthouse for the Blind of Hous.*, 696 F.2d 399, 404 (5th Cir. 1983)), and "scanty," *NLRB v. Laredo Packing Co.*, 730 F.2d 405, 407 (5th Cir. 1984) (per curiam).

Thryv is correct that the Board does not have "a free hand to impose any remedies it sees fit." Thryv Br. 41. The Court "must not, however, be more mindful of the limits of the Board's discretion than [it is] of [its] own limited function in reviewing Board orders." *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 362-63 (1951). By focusing on the *limits* of the Board's authority, Thryv obscures the breadth of remedies available under Section 10(c) and the Court's obligation to defer to the award of remedies within those limits.

## C. Section 10(c) Requires the Board to Award Make-Whole Relief Like the Remedy Ordered Here.

### 1. Section 10(c) Broadly Authorizes Make-Whole Remedies.

Once the Board determines that a respondent has engaged in an unfair labor practice, it "shall state its findings of fact and shall issue . . .

an order requiring such person to cease and desist from such unfair labor

practice, and to take such affirmative action ***including*** reinstatement of

employees with or without back pay, as will effectuate the policies of" the

Act.   29 U.S.C. § 160(c) (emphasis added).   "[T]he verb *to include*

introduces examples, not an exhaustive list."   *Starnes v. Wallace*, 849

F.3d 627, 636 n.9 (5th Cir. 2017) (quoting Antonin Scalia & Bryan A.

Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012)).

Reinstatement and backpay, therefore, are mere examples of "affirmative

actions" the Board can order as a remedy for unfair labor practices.   *See*

*Phelps Dodge Corp.*, 313 U.S. at 188-89.   To argue otherwise would

"shrivel" the broad authority Congress gave the Board.   *Id.* at 189.

Tellingly, Thryv does not quote the relevant statutory text in its

brief.   Here, the Board ordered Thryv to pay compensation for direct or

foreseeable pecuniary harms – affirmative action – to remedy unfair

labor practices.   The Board's choice of remedy thus complies with the

statutory mandate.

The limitation on the Board's authority to issue remedies is the

phrase "as will effectuate the policies of" the Act, not the phrase

"reinstatement of employees with or without back pay."   The express

policy of the Act is to eliminate "obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151. The Board's authority is thus "remedial, not punitive." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 236 (1938).

The Board may award remedies to "restore, so far as possible, the status quo that would have obtained but for the wrongful act." *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 265 (1969). Make-whole remedies "vindicate" public rights by mitigating and eliminating the harms caused by industrial conflict. *Va. Elec. & Power Co.*, 319 U.S. at 543. The Board's remedies must *repair* employees – "restor[ing] . . . what was taken from them because of" a respondent's unfair labor practices, *id.* – and *disgorge* respondents of any "advantages accruing from a particular method of subverting the Act," *id.* at 541. For these reasons, in *Mid-South Bottling Co.*, this Court enforced a Board order directing an employer to reopen its facility and reestablish operations using previously laid-off employees. 876 F.2d at 460-61. The remedy was lawful because it was tailored to make employees whole. *Id.*

Relying on *Republic Steel Corp. v. NLRB*, 311 U.S. 7 (1940), Thryv argues that the Board can award only "traditional remedies." Thryv Br. 42. In *Republic Steel*, the issue was whether the Board could require an employer to pay backpay to government agencies to redress an injury to the public. 311 U.S. at 9. That award was essentially a penalty – it did not repair any harm to the affected employees. *Id.* at 9-10. Because the Act "is essentially remedial," the Board does not have discretion to order a solely-punitive award. *Id.* In overturning the Board's remedy, the Court observed that the Board still had a number of lawful remedies at its disposal: The Board may require an employer to end its unfair labor practices; to recognize a labor organization; "to cease particular methods of interference, intimidation or coercion"; to disestablish a dominated labor organization; "to restore and make whole" unlawfully discharged employees; "and otherwise to take such action as will assure to his employees the rights which the statute undertakes to safeguard." *Id.* at 12. These are the "traditional" remedies recognized in *Republic Steel*. Narrowing "traditional" any further would misstate *Republic Steel*'s holding and ignore the Act's unambiguous statutory text.

Section 706(g)(1) of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e-5(g)(1), similarly provides for affirmative action "including"
reinstatement and backpay for Title VII violations. *See Pollard v. E.I. du
Pont de Nemours & Co.*, 532 U.S. 843, 848-49 (2001). In *International
Brotherhood of Teamsters v. United States* – decided *before* Congress
expressly allowed compensatory and punitive damages for Title VII
violations, *see* 42 U.S.C. § 1981a(b) – the Supreme Court awarded "all
appropriate relief" after an employer engaged in a "pattern of
discriminatory hiring, assignment, transfer, and promotion policies." 431
U.S. 324, 347-48 (1977). It specifically awarded retroactive seniority "as
a *direct remedy* for this discrimination." *Id.* (emphasis added). The Court
did not limit the remedy to reinstatement and backpay. And in *Pollard*,
the Court found that front pay – "money awarded for lost compensation
during the period between judgment and reinstatement or in lieu of
reinstatement," 532 U.S. at 846 – was authorized under Section 706(g)
just as it is under Section 10(c), despite not being expressly listed in
either statute. *Id.* at 848-49. Under Section 10(c), then, the Board
undoubtedly has authority to issue make-whole remedies beyond
reinstatement and backpay.

2.     *Compensation for Direct or Foreseeable Pecuniary Harms Makes Employees Whole After Unfair Labor Practices.*

Reinstatement and backpay indisputably effectuate the policies of the Act by restoring the status quo.  *See J.H. Rutter-Rex Mfg. Co.*, 396 U.S. at 265.  But loss of job and income are not the only economic harms that flow from unfair labor practices.

The Board routinely remedies *direct* economic harms, which are harms where the injured party's "loss was the direct result of the Respondent's illegal conduct."  *BRC Injected Rubber Prods., Inc.*, 311 N.L.R.B. 66, 66 n.3 (1993).   In *BRC Injected Rubber Products*, an employer violated the Act by forcing an employee to do "pit work" because of her union activity.  That was a "dirty and messy job" that ruined the employee's clothes.  *Id.*  The direct result of the unfair labor practice, then, was the loss of usable clothing, and the Board made the employee whole by requiring compensation for the ruined clothes.  *Id.*

Similarly, in *Napleton 1050, Inc.*, an employer committed an unfair labor practice by removing employees' toolboxes from the shop in retaliation for protected strike activity.  367 N.L.R.B. No. 6, slip op. at 1 (Sept. 28, 2018), *enforced*, 976 F.3d 30 (D.C. Cir. 2020).  The toolboxes

were left out in the rain, where the tools inside were damaged. The damage to the tools was a direct result of the employer's unfair labor practice, and the Board found it "necessary" to make the employees whole for their loss. *Id.* at 4. And in *NLRB v. Miami Coca-Cola Bottling Co.*, this Court enforced the Board's order that an employer pay an annual safety award that an employee could have been eligible for had he not been unlawfully discharged. 360 F.2d 569, 572 (5th Cir. 1966). The employee's ineligibility was a direct result of the employer's unfair labor practice.

The Board has further directed labor-law violators to compensate employees for *foreseeable* economic harms – harms that a respondent "knew or should have known . . . would be likely to result" from its violation of the Act. *Foreseeable Damages*, *Black's Law Dictionary* (11th ed. 2019). Medical bills are a common example. *See NLRB v. LIUNA*, 748 F.2d 1001, 1006 (5th Cir. 1984); *Nortech Waste*, 336 N.L.R.B. 554, 554 n.2 (2001). In *Voorhees Care & Rehabilitation Center*, the employer unilaterally modified the collective bargaining agreement, including by changing the health insurance plan. 371 N.L.R.B. No. 22, slip op. at 3 (Aug. 25, 2021). One foreseeable result of that change was "substantial

medical bills" that were no longer covered by the new plan. *Id.* at 3-4. The Board, as a result, required the employer to pay those bills for the employees. *Id.*

Similarly, the Board in *Baker Manufacturing Co.* ordered an employer who unlawfully terminated an employee to reimburse that employee for work-related courses taken after the discharge. 269 N.L.R.B. 794, 810 (1984), *enforced in relevant part*, 759 F.2d 1219 (5th Cir. 1985). The employer had offered to reimburse those courses shortly before the discharge, meaning the employer must have foreseen that the employee would be left paying the bill after he was fired.

The Board also awards compensation for search-for-work and interim-employment expenses after unlawful terminations because an employer that unlawfully lays off its employees should know that the employees will likely search for new jobs. *See King Soopers, Inc.*, 364 N.L.R.B. 1153, 1158 (2016), *enforced in relevant part*, 859 F.3d 23 (D.C. Cir. 2017). For example, in *Ampersand Publishing, LLC*, an employee relocated to find a job. The Board awarded him travel expenses, meals, mileage, and moving expenses – all of which foreseeably flowed from the

unlawful termination.  370 N.L.R.B. No. 119, slip op. at 9 (Apr. 29, 2021), *enforced*, 43 F.4th 1233 (9th Cir. 2022).

### 3.    *Compensation for Direct or Foreseeable Pecuniary Harms Is Not Consequential Damages.*

Compensation for direct or foreseeable pecuniary harms is *not* consequential damages because it does not remedy harms beyond the direct or reasonably foreseeable consequences of a breach.[7]  *See Hadley v. Baxendale* [1854] EWHC (Exch) J70, 156 ER 145;[8] 11 Corbin on Contracts § 56.6 (2023).

*Hadley v. Baxendale* is the classic illustration of consequential damages.  There, a shipper failed to timely return a crank shaft to a business, causing significant profit losses.  The court found, however, that the business could not recover lost profits because they were not directly or reasonably foreseeably caused by the breach – they were consequential damages.  Compare *Hadley* with this Court's decision in

---

[7]    The Board's decision acknowledges that although it used the term "consequential damages" in its Notice and Invitation to File Briefs, consequential damages is a term of art that does not describe the make-whole remedy ordered.  The Board stated that, "[a]ccordingly, we stress today that the Board is not instituting a policy or practice of awarding consequential damages, a legal term of art more suited for the common law of torts and contracts."  ROA.3087-88.

[8]    https://www.bailii.org/ew/cases/EWHC/Exch/1854/J70.html

*Hector Martinez & Co. v. Southern Pacific Transportation Co.*, 606 F.2d 106 (5th Cir. 1979). There, a shipper delayed returning a dragline excavator to the customer, and the customer sought damages for the *lost use* of the machinery. Unlike the lost profits caused by a delay in delivering the crank shaft in *Hadley*, the lost use caused by the delay in *Hector Martinez & Co.* was foreseeable because "it was obvious" that the dragline had use value. *Id.* at 109.

Similarly, in *National Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 550 (5th Cir. 2005), the Court awarded a circus show compensation for lost ticket sales and the cost of renting replacement bleachers when a shipper failed to timely deliver them. Because the shipper had previously done business with the customer and should have foreseen the harm that would result from late delivery, the Court's award was not an award of consequential damages. And in *Jab Energy Solutions II, LLC v. Servicio Marina Superior, LLC*, the Court held that the costs of hiring a new tugboat after one tugboat failed to complete the job "stem[med] from the direct, immediate and foreseeable consequence of the [original tugboat's] being unable to perform the voyage." 640 F.

App'x 373, 378 (5th Cir. 2016) (per curiam).  Again, those damages were not consequential damages.

The Board's award of compensation for direct or foreseeable pecuniary harms is, by definition, not consequential damages.  Just as this Court upheld the damages award in *Jab Energy Solutions* because the tugboat's failure to complete the voyage foreseeably caused harm, 640 F. App'x at 378, so too did this Court uphold the Board's remedy in *Baker Manufacturing* where the employer's unlawful discharge foreseeably caused the employee to shoulder the cost of work-related courses the employer had promised to reimburse.  269 N.L.R.B. at 810, *enforced in relevant part*, 759 F.2d 1219 (5th Cir. 1985).

It does not matter that some foreseeable harms are more than one step away from the unfair labor practice, and therefore could be deemed "indirect."  Take, for example, an employer that unlawfully lays off an employee, knowing that the employee will likely have to spend money or even move to find a new job.  *E.g., King Soopers*, 364 N.L.R.B. at 1158. That employer is like the shipper in *National Hispanic Circus*, which should have known that its delay could decrease ticket sales for the circus show even though the lost sales were several steps away from its breach.

414 F.3d at 550.   An order to pay the foreseeable search-for-work expenses is thus no more an award of consequential damages than the order in *National Hispanic Circus.  See id.*

The purpose and predominant effect of awarding relief for direct or foreseeable pecuniary harm is to "restore . . . what was taken from [employees] because of" a respondent's unfair labor practices and to disgorge respondents of any "advantages accruing from a particular method of subverting the Act." *Va. Elec. & Power Co.*, 319 U.S. at 541, 543.   Respondents may not be permitted to retain the benefits they receive because of their unfair labor practice – whether those benefits were a direct result of the misconduct or whether the respondent knew or should have known those benefits were likely to result from the misconduct – and employees should be made whole for violations of the Act.

> 4.    *The Potential Remedies Discussed by the Board Fit Comfortably Within the Board's Remedial Authority.*

Among other remedies, the Board ordered compensation for all direct or foreseeable pecuniary harms resulting from the layoffs, including reasonable search-for-work and interim-employment expenses, regardless of whether those expenses exceeded interim earnings.

ROA.3093. As just explained, that award is a "reasonably defensible" exercise of the Board's Section 10(c) authority. *Alcoa, Inc.*, 849 F.3d at 255 (quoting *Motorola, Inc.*, 991 F.2d at 282).

Thryv argues that the Board's award is punitive for two reasons. First, Thryv claims the employees were underperforming, knew their jobs were insecure, and were on notice of the layoff, meaning they "knew the associated risk of any downstream economic consequences." Thryv Br. 46-47. And second, Thryv claims that the Board's order to calculate compensation without regard to interim earnings shows that the Board "intends to resolve any ambiguities in the evidence against the employer." *Id.* at 47.

Thryv's first argument is absurd, and its implications are breathtaking. Thryv urges this Court to overturn the Board's remedy because the unlawfully laid off employees allegedly knew that Thryv was facing difficulties and therefore would proceed with its unlawful layoffs. Thryv would have its employees' awareness of an approaching unfair labor practice somehow mitigate the harm caused by that unfair labor practice, even though the Act protects employees from *any* interference, restraint, or coercion of their right to collectively bargain (not just

surprise interferences, restraints, or coercion). 29 U.S.C. §§ 157, 158(a)(1). If Thryv's argument is accepted, this Court will create a new cottage industry of experts who will help respondents evade the consequences of their unfair labor practices by asserting that the respondent's negative financial condition precludes any effective remedy of its admittedly unlawful conduct.

The Board's refusal to apply interim earnings against pecuniary harms other than lost pay does not indicate that its remedy is intended as punitive. Indeed, such a policy is consistent with the Board's jurisprudence. *King Soopers, Inc.*, 364 N.L.R.B. at 1157-58. The D.C. Circuit rejected the very argument made here by Thryv, holding that the Board is entitled to "considerable deference in crafting remedies for unfair labor practices" and that its make-whole remedial framework was "[l]awful, [r]easonable, and [f]ully [j]ustified." *King Soopers, Inc. v. NLRB*, 859 F.3d 23, 36-37 (D.C. Cir. 2017).

Thryv's arguments, moreover, are reasons to proceed to the Board's compliance procedures, not to overturn the Board's decision. As explained above, Thryv will have ample opportunity to challenge the level of damages awarded before the Board. The Board's compliance

proceedings – not this Court's review and enforcement proceedings – "provide the appropriate forum" for "tailoring the remedy to suit the individual circumstances" of this case. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984).

## CONCLUSION

This Court should grant the NLRB's application for enforcement and deny Thryv's petition for review.

Respectfully submitted,

<u>s/ Lucas R. Aubrey</u>
Jonathan D. Newman
Lucas R. Aubrey
   D.C. Bar No. 982849
Jacob J. Demree
Sherman Dunn, P.C.
900 Seventh St., N.W., Suite 1000
Washington, D.C. 20001
(202) 785-9300

August 18, 2023

## CERTIFICATE OF SERVICE

I certify that on August 18, 2023, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

<u>s/ Jacob J. Demree</u>
Jacob J. Demree
*Counsel for Intervenor*

# CERTIFICATE OF COMPLIANCE

1.   This document complies with the type-volume limit of Rule 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), it contains 8,570 words.

2.   This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font and fourteen-point type.

<u>s/ Lucas R. Aubrey</u>
Lucas R. Aubrey
*Counsel for Intervenor*