# United States Court of Appeals for the Fifth Circuit

---

No. 23-60132

---

United States Court of Appeals
Fifth Circuit

**FILED**

May 24, 2024

Lyle W. Cayce
Clerk

THRYV, INCORPORATED,

*Petitioner/Cross-Respondent*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

---

Petition for Review of an Order
of the National Labor Relations Board
Agency Nos. 20-CA-250250,
20-CA-251105

---

Before KING, JONES, and OLDHAM, *Circuit Judges*.

ANDREW S. OLDHAM, *Circuit Judge*:

Thryv, Inc. had a long-running dispute with the union representing some of its sales employees. The union complained to the National Labor Relations Board, alleging Thryv engaged in several unfair labor practices. The Board agreed with the union and ordered Thryv to take draconian steps to remedy the alleged violations. Thryv petitioned us for review. We grant Thryv's petition and vacate the Board's order in part.

No. 23-60132

I.

This action is the culmination of a multiyear standoff between Thryv and Local 1269 ("the Union"). We (A) explain the legal context for that standoff. Then we (B) describe the facts that gave rise to the present controversy. Lastly we (C) summarize the agency proceedings.

A.

Section 8(a)(5) of the National Labor Relations Act imposes a duty upon employers and recognized unions to bargain in good faith with respect to mandatory subjects of bargaining—that is, "wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d); *see id.* § 158(a)(5) ("[I]t shall be an unfair labor practice . . . for an employer to refuse to bargain collectively with the representatives of his employees . . . ."). Ordinarily, an employer violates that duty if it imposes a unilateral change on a mandatory subject of bargaining. *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1237 (D.C. Cir. 2012).

But the NLRA compels only bargaining; it does not obligate employers and unions to reach any form of agreement. *See* 29 U.S.C. § 158(d) (noting the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession"). Thus, employers must bargain in good faith, but they are never required to agree to any particular terms.

So what happens when an employer insists on a term that is a nonstarter for the union? "[T]he [NLRA] does not encourage a party to engage in fruitless marathon discussions . . . ." *NLRB v. Am. Nat'l Ins.*, 343 U.S. 395, 404 (1952). So if the employer demands a term that the union refuses to accept, labor law must provide a tool to pretermit an endless cycle of go-nowhere negotiations.

No. 23-60132

That tool is the impasse doctrine. Under that doctrine, employers can declare an impasse with a union "if there is no realistic possibility that continuation of discussions would [be] fruitful." *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001) (quotation omitted). Once the employer declares an impasse, it does not violate the NLRA by making unilateral changes so long as the "changes [it makes] are reasonably comprehended within [the employer's] pre-impasse proposals." *Comau*, 671 F.3d at 1237 (quotation omitted). "The rationale for this rule is that . . . [i]t moves the [bargaining] process forward by giving one party, the employer, economic leverage." *Ibid.* (quotation omitted).

When employers and unions reach impasse with respect to a collective bargaining agreement—an overall impasse—employers generally make unilateral changes by imposing their last best, final offer ("LBFO"). Once implemented, the LBFO governs relations between the employer and the union until the overall impasse breaks. *See Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 506 (5th Cir. 2002). But the point of the impasse doctrine is only to jumpstart bargaining by forcing the union into concessions. *See Comau*, 671 F.3d at 1237. So unions may break an overall impasse at any point—and thus suspend an employer's entitlement to rely on an LBFO—by demonstrating that a resumption in bargaining might be fruitful. *See Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1399 (5th Cir. 1983).

B.

Thryv sells Yellow Pages advertising. For decades, the structure of the telephone industry ensured Yellow Pages companies like Thryv were essentially monopolists in their respective jurisdictions. The companies earned supra-competitive profits and employed an army of sales representatives to drive business. But the internet changed that. While Yellow Pages companies still exist in this digital age, they do a fraction of the

business they once did, and they need fewer representatives to drive new business.

In 2019, Thryv had a small group of sales representatives that was responsible for selling business to customers who did not already have accounts with the Company. These New Business Advisors ("NBAs") "were not bringing in sufficient revenues to cover [even] their base salaries," ROA.3106, likely because there were not a lot of new Yellow Pages customers to go around. So in July of 2019 Thryv started to discuss laying them off.

But Thryv could not simply lay off the NBAs because they were part of a union. Ordinarily, when a company wants to lay off unionized employees, it follows the procedures prescribed in the parties' collective bargaining agreement ("CBA"). Thryv and the Union, however, were not operating under a CBA because their CBA had expired, and they had not yet reached agreement on a successor. The absence of a new agreement was not for want of trying; the parties negotiated for over a year before Thryv declared impasse and implemented its LBFO in September of 2018. The Union filed an unfair labor practice charge related to Thryv's impasse declaration, but the NLRB's General Counsel dismissed it.

So, as of summer 2019, it appears undisputed that Thryv had properly implemented its LBFO and was operating under it. Article 30 of the LBFO prescribed the procedures Thryv would follow in the event of an economic layoff:

> Whenever conditions are considered by the Company such as to warrant layoffs, part-timing, reclassifications or a combination thereof, the Company agrees to give the Union designee IBEW 1269 or his/her authorized representative *thirty (30) calendar days' notice* of its intended plan, together with a description of work locations, job titles (levels within

No. 23-60132

channels) and work groups so affected as determined by the Company.

After such *notice and discussion* with the Union designee IBEW 1269 or his/her authorized representative, the plans developed by the Company shall be implemented subject to the following procedural steps:

> 1. Temporary employees in the affected work locations, job titles and work groups shall be separated from the payroll.

> 2. The Company shall, in order of seniority, offer to the employees in such job titles considered to be surplus, if qualified, transfers to other positions in the Company if there are any openings that the Company determines are to be filled.

> 3. Offer voluntary separation payments to employees in the affected job titles and work locations by seniority. The number of employees who make such election shall not exceed the number of employees determined by the Company to be surplus. The Company will set the separation date(s) that are applicable to employees electing voluntary separation. An employee's election to leave the service of the Company and receive voluntary separation payments must be in writing and delivered to the Company within ten (10) working days from the date of the Company's offer (or such longer time as the Company may permit). Disputes related to voluntary separation are not subject to the arbitration provision of this Agreement.

> 4. Lay off regular full-time and part-time employees in surplus in the inverse order of seniority. Such employees shall receive involuntary separation pay.

ROA.3305–06 (emphasis added).

No. 23-60132

In accordance with Article 30, Thryv notified the Union on August 21, 2019, of its intention to lay off the NBAs in 30 days. Thryv directed the Union to reach out if it "desire[d] to exercise its right to meet and discuss the Company's plan within the 30-day period." ROA.3756. The Union asked to confer about the layoffs but claimed it was not available until September 11— twenty-one days after Thryv's notification. So before Thryv and the Union met, Thryv held an explanatory meeting with the NBAs to announce its plans and explain the NBAs' rights under the LBFO—most notably severance pay. The Union attended Thryv's meeting with the NBAs, notwithstanding that it told Thryv it was not available for discussions that day.

Eventually, Thryv and the Union held a series of meetings related to the layoffs. In those meetings, Thryv made clear it was planning to proceed with the layoffs under the procedures prescribed in the LBFO, but Thryv nevertheless told the Union it was open to counterproposals. It is disputed whether the Union offered one. But it is not disputed that the Union refused to recognize Thryv's layoff proposal. Nor is it disputed that the Union told Thryv the LBFO was illegitimate, that Thryv was violating the LBFO, and that Thryv was withholding information the Union needed to bargain effectively. For obvious reasons, then, the parties made little progress in their negotiations. Thryv thus moved forward with the layoffs as planned on September 20, 2019, when the LBFO's notice period expired. The parties continued discussions after the layoffs to no avail.

Separately, sometime before September 20, the Union expressed to Thryv a desire to recommence bargaining for a successor CBA. The parties came to an agreement on November 14, 2019.

No. 23-60132

## C.

### 1.

Following the layoffs, the Union filed a charge with the NLRB. The Union alleged Thryv violated § 8(a)(5) and (1) of the NLRA by failing to bargain in good faith before making a unilateral change to the terms of the NBAs' employment—namely laying them off—and by failing to respond to a series of the Union's information requests.

In response to the Union's charge, the NLRB's General Counsel issued a complaint against Thryv. In essence, the General Counsel alleged Thryv had an obligation to bargain with the Union in good faith before laying off the NBAs. And the General Counsel alleged Thryv breached that obligation by (1) presenting the layoffs as a *fait accompli* and (2) withholding information from the Union that the Union needed to bargain effectively. Like the Union, the General Counsel also separately charged in the complaint that Thryv violated § 8(a)(5) and (1) by failing to respond to the Union's information requests.

Thryv denied all relevant charges. Notably, Thryv contended in its answer that it had no obligation to bargain about the layoffs because it implemented them in accordance with Article 30. *See* ROA.995 ("Respondent did not make a discretionary unilateral change to the terms and conditions of employment under the status quo effective as of November 1, 2018 when Respondent followed the mandatory and bilateral process set forth in Article 30.2 of the LBFO by providing the Union with advanced written notice of the planned force adjustment on August 21, 2019, affording the Union an opportunity to meet and discuss this noticed plan before the noticed resolution date of September 20, 2019, and then implementing this noticed plan by terminating employees with the option to receive 'involuntary separation pay' as defined in Article 30.4 of the LBFO.").

No. 23-60132

2.

After a six-day trial before an administrative tribunal, an Administrative Law Judge ruled for the General Counsel in part and for Thryv in part. The ALJ mostly agreed with the General Counsel that Thryv failed to respond to the Union's information requests. He found Thryv committed six unfair labor practices by withholding information the Union requested between April and October of 2019.

But the ALJ disagreed with the General Counsel that Thryv's layoffs violated the NLRA. Like the General Counsel, he reasoned Thryv had an obligation to bargain with respect to the layoffs, but he found Thryv complied with that obligation because it bargained in good faith. Specifically, the ALJ found (1) that Thryv did not present the layoffs as a *fait accompli*, and (2) that the information Thryv failed to provide to the Union did not prevent the Union from bargaining effectively.

Accordingly, the ALJ ordered Thryv to cease and desist from withholding information from the Union and to provide the Union with the information it requested. But the ALJ did not order Thryv to reinstate the NBAs or provide any other relief for damages arising from their termination.

3.

The Board affirmed the ALJ's finding that Thryv violated § 8(a)(5) and (1) by failing to comply with the Union's information requests. But it disagreed with the ALJ about the layoffs and held them unlawful.

The Board so held for two reasons. First, the Board concluded, like the ALJ, that Article 30 did not absolve Thryv of its bargaining obligations. And *contra* the ALJ, the Board found Thryv failed to bargain because (1) Thryv presented the layoffs to the Union as a *fait accompli*, and (2) Thryv's

failure to supply the Union with information precluded the Union from bargaining effectively.

Second, the Board found—*sua sponte*—that the parties' impasse was broken when Thryv laid off the NBAs on September 20 because by that time the parties had resumed negotiations on a successor CBA. And according to the Board, an employer is precluded from making unilateral changes of any kind while it is engaged in CBA negotiations with a union. *See* ROA.3084 ("[Thryv] violated Section 8(a)(5) and (1) by implementing unilateral layoffs while the parties were negotiating over the successor agreement, as there is no evidence that overall impasse had been reached on the agreement as a whole.") (citing *Bottom Line Enters.*, 302 N.L.R.B. 373, 374 (1991), *enfd. sub nom. Master Window Cleaning, Inc. v. NLRB*, 15 F.3d 1087 (9th Cir. 1994) (table case)). That means in the Board's view no amount of bargaining could have cleansed the layoffs. At the time Thryv initiated them it simply was not permitted to make any changes to the terms or conditions of the NBAs' employment without Union consent.

So in addition to the remedies ordered by the ALJ, the Board ordered Thryv to reinstate the NBAs. Moreover, it ordered Thryv to make the NBAs whole for all the losses incurred as a direct or foreseeable result of the layoffs—a novel, consequential-damages-like labor law remedy.

## II.

Thryv timely petitioned for review of the Board's order, and the Board cross-petitioned for enforcement. We have jurisdiction under 29 U.S.C. § 160(f). We review the Board's conclusions of law for rationality and consistency with the NLRA. *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013). And we review the Board's findings of fact for substantial evidence. *Dish Network Corp. v. NLRB*, 953 F.3d 370, 376 (5th Cir. 2020). That means we uphold the Board's factual findings only if they are supported

by evidence that is substantial when viewed in light of the record as a whole, including "whatever in the record fairly detracts from its weight." *Ibid.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Applying those standards, we (A) explain Thryv's layoffs did not violate the NLRA. Then we (B) dispense with the Board's order respecting the information requests.

## A.

The Board held Thryv violated the NLRA by unilaterally laying off six NBAs. We disagree. We (1) explain the LBFO displaced Thryv's NLRA-conferred obligation to bargain about the layoffs. Then we (2) reject the Board's arguments that we must nonetheless enforce its order.

## 1.

Layoffs are a mandatory subject of bargaining. That means, as a general rule, an employer violates § 8(a)(5) and (1) of the NLRA when it lays off employees unilaterally. *See Lapeer Foundry & Mach.*, 289 N.L.R.B. 952, 954 (1988).[1] On the basis of this general rule, the Board held Thryv "was obligated [by the NLRA] to bargain [with the Union] over the decision to lay off the New Business Advisors." ROA.3083. And it held that was true whether or not the LBFO was in effect when the layoffs occurred.

The Board was wrong. In fact, assuming the LBFO was in effect, it absolved Thryv of its NLRA-conferred obligation to bargain about layoff

---

[1] Really, the employer violates § 8(a)(5). But "[a]n employer who violates section 8(a)(5) also derivatively violates section 8(a)(1), which makes it unlawful for an employer 'to interfere with, restrain, or coerce employees in the exercise of' their statutory labor rights." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 n.1 (D.C. Cir. 2011) (quotation omitted). Section 8(a)(1) thus "presents no separate issues." *Allied Chem. & Alkali Workers of Am., Loc. Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 163 n.6 (1971).

decisions. That is because once Thryv lawfully implemented its LBFO, the LBFO set the terms of the relationship between Thryv and the NBAs. *See, e.g.*, *Comau*, 671 F.3d at 1237 n.11. The LBFO included Article 30, through which Thryv reserved discretion to initiate layoffs subject only to limited qualifications—including the requirement of thirty days' notice, an opportunity for discussion with the Union, and severance pay. Thus, Thryv was privileged to lay the NBAs off without bargaining so long as it complied with the terms of Article 30.

In holding otherwise, the Board apparently reasoned that even a lawful impasse declaration does not license an employer to impose a "management rights" clause upon a union—that is, an LBFO provision by which the employer reserves discretion to take future unilateral action on a mandatory subject of bargaining. *See* ROA.4287 ("[T]he implemented final offer [did] not excuse [Thryv] from its bargaining obligation with respect to the layoff decision." (citation and quotation omitted)).

Again, the Board was wrong. The fact that Article 30 left Thryv with discretion does not mean Article 30 fell outside the ordinary impasse rules. This court has long held that employers are permitted to implement management rights clauses (like Article 30) at impasse, and that such clauses in fact privilege employers to take unilateral action on subjects (like layoffs) that would otherwise require bargaining. *See Raven Servs.*, 315 F.3d at 504 ("We have . . . held that [management rights] clauses may be implemented at impasse.") (citing *NLRB v. Intracoastal Terminal, Inc.*, 286 F.2d 954, 958 (5th Cir. 1961)). Were it otherwise, the impasse doctrine would not actually break an impasse about a management rights clause: The union could prohibit adoption of such a clause by filibustering at the bargaining table forever.

Other courts have reached the same conclusion. For example, in *Colorado-Ute Electric Ass'n, Inc. v. NLRB*, 939 F.2d 1392 (10th Cir. 1991), a

Tenth Circuit panel considered an LBFO provision that vested the employer with discretion to impose future merit-based wage increases. *Id.* at 1398. When the employer granted merit increases pursuant to that provision, the union filed an unfair labor practice charge. *Id.* at 1399. The Board held that because the employer "failed to secure a waiver of the Union's statutory right to bargain over the merit increases' timing and amounts, the Respondent was not free to grant increases without consulting with the Union about these matters." *Id.* at 1400 (quotation omitted). And that was true notwithstanding the LBFO provision because in the Board's view, the union had a right to bargain about "particular economic terms" rather than "a general proposal that the employer be permitted to exercise discretion with respect to merit wage programs." *Id.* at 1401 (emphasis omitted) (quotation omitted).

The panel rejected that argument. It agreed with the Board that merit wages are a mandatory subject of bargaining, *id.* at 1400, and that "an employer cannot use its economic power to remove [the] subject completely from the bargaining table," *id.* at 1404. But it concluded, *contra* the Board, that the employer satisfied its bargaining obligations by bargaining over the merit wage increase provision in the runup to the implemented LBFO. *Ibid.* That was true even though the employer insisted on a provision that vested it with *discretion* to implement merit wages rather than a provision establishing the *particular terms* of merit wages. *Id.* at 1402. The reason, the court explained, is that "an employer *vindicates* the union's right to bargain" when it "vigorously bargain[s] over how a discretionary . . . clause [will] be implemented." *See id.* at 1403 (emphasis in original) (quotation omitted). And since an employer vindicates the union's rights when the parties bargain over the discretionary clause in the first instance, the employer has no obligation—beyond those specified in the LBFO—to re-vindicate the union's rights upon deciding to take action pursuant to the discretionary

No. 23-60132

clause. In short, *Colorado-Ute* held that management rights clauses are subject to ordinary impasse rules.

That rule follows logically from Supreme Court precedent. As *Colorado-Ute* explained, the Supreme Court has held nothing in the NLRA precludes employers from insisting on "strong management-rights clause[s], in which . . . employer[s] 'reserve[] . . . the right to take unilateral action with respect to'" mandatory subjects of bargaining. *Colorado-Ute*, 939 F.2d at 1402 (quoting *Am. Nat'l Ins.*, 343 U.S. at 400 n.5). If employers are allowed to insist on strong management rights clauses, they must be allowed to try to obtain those clauses by using the "economic weapon of implementing at impasse." *Colorado-Ute*, 939 F.2d at 1404. A contrary rule would make an employer's right to implement a final offer at impasse dependent on the substantive content of that offer, which is at odds with the well-established proposition that the NLRA was not meant to dictate the outcome of the collective bargaining process. *See Am. Nat'l Ins.*, 343 U.S. at 404 ("[I]t is . . . clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."); *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 490 (1960) (explaining the NLRA does not "contain a charter for the National Labor Relations Board to act at large in equalizing disparities of bargaining power between employer and union"); *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 103–04 (1970) ("[T]he object of [the NLRA] was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees [can] work together to establish mutually satisfactory conditions. . . . [A]greement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement.").

No. 23-60132

It is true that the D.C. Circuit broke with *Colorado-Ute* in *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026 (D.C. Cir. 1997). In that case, a panel reasoned the Board is entitled to determine that at least some management rights clauses are beyond the scope of the impasse rule. But *McClatchy* expressly limited its holding to provisions relating to the "grounds for and timing of wage increases." *Id.* at 1035. And the D.C. Circuit has refused to extend the *McClatchy* doctrine beyond those narrow grounds. *See Mail Contractors of Am. v. NLRB*, 514 F.3d 27, 36 (D.C. Cir. 2008) (declining to extend *McClatchy* while explaining that "[t]he Board must proceed cautiously in applying the . . . doctrine, taking care to tether its applications to the pragmatic justification for that decision . . . .").

And in any event, with respect, the *McClatchy* panel underread one Supreme Court decision and overread another. First, the *McClatchy* panel underread the Supreme Court's decision in *American National Insurance*. The Supreme Court held that nothing in the NLRA precludes employers from insisting on sweeping management rights clauses—but the D.C. Circuit resisted that conclusion. *Compare Am. Nat'l Ins.*, 343 U.S. at 409 (holding the degree of discretion in a CBA "is an issue for determination across the bargaining table, not by the Board"), *with McClatchy*, 131 F.3d at 1034 (suggesting some management rights clauses might constitute an evasion of an employer's duty to bargain collectively). Moreover, the Supreme Court instructed the Board not to "indirectly . . . sit in judgment upon the substantive terms of collective bargaining agreements." *Am. Nat'l Ins.*, 343 U.S. at 404. But the *McClatchy* panel allowed the Board to impose different bargaining rules based on the substance of an employer's proposal. *See McClatchy*, 131 F.3d at 1034. In doing so, the *McClatchy* panel tipped the scales against management rights clauses—just the kind of indirect regulation of substantive CBA terms that is forbidden under *American National Insurance*.

No. 23-60132

Second, the *McClatchy* panel overread the Supreme Court's decision in *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404 (1982). The panel read *Bonanno Linen* to require sweeping deference to the Board over "the dynamics of collective bargaining." *McClatchy*, 131 F.3d at 1034. But *Bonanno Linen* stands for no such proposition. The Court in that case afforded the Board deference to shape the contours of multiemployer bargaining, but only because multiemployer bargaining was entirely "voluntary," 454 U.S. at 412, meaning an employer was free to "condition[] its participation in group bargaining on any special terms of its own design," *id.* at 420 (Stevens, J., concurring).[2] That hardly suggests courts should uncritically defer to the Board's judgment about matters of collective bargaining that are not voluntary, like negotiating with a union when required to do so by the NLRA. Thus, even if we could depart from our precedent, *McClatchy* would not persuade us that management rights clauses are subject to their own set of impasse rules.[3]

In sum, Thryv was permitted to implement Article 30 upon reaching an impasse with the Union. That means Thryv's only obligation in laying off the NBAs was to comply with Article 30. And there can be no serious dispute that Thryv did so.[4] Article 30 required Thryv to do three things: (1) provide

---

[2] Justice Stevens supplied the fifth vote for the Court's opinion, so his concurrence suggests the contours of the Court's holding.

[3] It is worth noting the Board did not even try to justify its holding that management rights clauses do not absolve employers of their obligation to bargain over layoffs. The Board merely affirmed the ALJ's finding on this point. And the ALJ merely pointed to a Board precedent about § 7 rights. ROA.3126 (citing *Kingsbury, Inc.*, 355 N.L.R.B. 1195 n.1, 1205 (2010)). Those rights present a substantially different problem than the bargaining rights secured by § 8. *See NLRB v. McClatchy Newspapers, Inc. Publisher of The Sacramento Bee*, 964 F.2d 1153, 1169 (D.C. Cir. 1992) (Opinion of Edwards, J.).

[4] The Board suggests Thryv violated the LBFO by failing to consider integrating the NBAs into other positions within the Company. But the LBFO states only that "[t]he parties agree to review the need for the New Business Advisor-Premise role at six-month

the Union thirty days' notice before initiating layoffs; (2) provide the Union an opportunity to discuss the layoffs; and (3) offer severance payments to the affected employees. Thryv did all three: It (1) notified the Union of its plans on August 21, 2019, 30 days before the layoffs occurred; (2) made itself eminently available to bargain over the layoffs with the Union during the thirty-day notice period; and (3) offered voluntary severance payments to all the affected NBAs. So assuming the LBFO was in effect when Thryv implemented the NBA layoffs, those layoffs did not violate the NLRA.

2.

The Board and the Union contend even if Article 30 could have freed Thryv from its NLRA-conferred bargaining obligations, we still must uphold the Board's order. They offer three reasons: (a) NLRA § 10(e) bars us from even considering the dispositive Article 30 issue; (b) Thryv failed to show the LBFO was lawfully implemented; and (c) Article 30 is irrelevant because the parties broke their impasse before the layoffs occurred. We reject all three arguments.

a.

First, the Board says we are barred by NLRA § 10(e) from even considering whether Thryv was privileged to initiate the layoffs pursuant to Article 30. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused

---

intervals to determine whether there has been sufficient change in the client base and staffing levels to absorb New Business Advisor(s)-Premise into the Business Advisor-Premise title." That clause does not obligate Thryv to consider integrating the NBAs into BA positions before laying them off. Rather, it obligates Thryv to review the matter every six months. And the General Counsel did not charge Thryv for failing to meet with the Union to consider absorbing the NBAs into BA positions.

because of extraordinary circumstances."). Framed charitably, the Board's argument goes like this: Thryv did not file exceptions to the ALJ's finding on the Article 30 issue. It therefore waived the issue and so lost its one chance to put the issue before the Board. *See* 29 C.F.R. § 102.46(f) ("Matters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding."). Thryv raised the issue in a motion for reconsideration, but by that time it was too late. *See id.* § 102.48(c) (allowing motions for reconsideration only "because of extraordinary circumstances"). Thus, Thryv never properly put the issue before the Board, which means Thryv cannot properly raise the issue before us.

The trouble with the Board's argument is that a party need only urge an issue "before the Board, *its member, agent, or agency*" to preserve it for review in a court of appeals. 29 U.S.C. § 160(e) (emphasis added); *see Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255 (1943) (per curiam) ("We do not find that, *at any stage of the proceedings before the Board*, the objection now urged as to the Board's lack of power was presented to it *or to any member or agent of the Board . . . .*") (emphases added); *see also Raven Servs.*, 315 F.3d at 508 (declining to consider an argument because the petitioner "never made [it] to *the ALJ or* the NLRB") (emphasis added). An ALJ is a member or agent of the Board. *See, e.g.*, 29 U.S.C. § 160(b) (referring to the Board official responsible for "conducting the hearing" as a "member[ or] agent"); *id.* § 160(c) (referring to the Board official responsible for taking testimony as a "member[ or] agent"). Thryv maintained before the ALJ that Article 30 established the relevant status quo, and that it was privileged to initiate layoffs according to the procedures prescribed by Article 30, because Thryv said so in its answer to the General Counsel's complaint. *See* ROA.995 ("[Thryv] did not make a discretionary unilateral change to the terms and conditions of employment under the status quo effective as of November 1, 2018 when Respondent followed the . . . LBFO . . . ."). So no matter whether

the Article 30 issue was urged before the Board, it was urged before a member or agent of the Board, and we may consider it.

*NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565 (5th Cir. 1962) (per curiam), is not to the contrary. The question presented in that case was whether § 10(e) barred an employer from raising objections that the employer did not put before the Board in written exceptions. *Id.* at 566. The employer argued § 10(e) was no bar because the employer raised the relevant objections in an apparently informal "telephone conversation" with a Board attorney. *Ibid.* On the employer's telling, the Board's attorney was an "agent" of the Board, so the employer's informal telephonic objections satisfied § 10(e). A panel of this court rejected the employer's argument. *Ibid.* It explained that if courts could review any objection raised before an agent of the Board (even informally, in an unrecorded phone call), the Board would have no means to limit the universe of issues it was required to consider. *Ibid.*

This case does not present the same problem. That is because Thryv made the relevant objection in its answer to the General Counsel's complaint—*i.e.*, on the record in a formal part of its NLRB proceeding. Unlike the employer's informal objection in *Mooney Aircraft*, Thryv's objection should have been sufficient to put the Board on notice. *Mooney Aircraft* thus does not control. It might be more convenient for the Board if reviewing courts could consider only objections raised in written exceptions to ALJ findings. But there is no basis for the Board's position in the text of § 10(e). If applying that text faithfully means the Board is required to review the record to familiarize itself with issues that might surface on appeal of its orders, so be it.

In all events, Thryv *did in fact* urge the Article 30 issue before the Board itself. Thryv dedicated several pages of its motion for reconsideration to explaining the Board ignored that Article 30 established the status quo and

governed the layoffs. And the Board clearly understood Thryv's Article 30 argument. ROA.4286 (noting Thryv "contends that this LBFO privileged the layoffs at issue in this case"); ROA.4287 (rejecting Thryv's motion for reconsideration while noting "the Respondent failed to advance in its exceptions before the Board the argument that Article 30 of the LBFO may be read to permit the Respondent to implement layoffs without bargaining").

Our precedent says a party can properly exhaust its arguments by raising them for the first time in a motion for reconsideration before the Board. For example, in *Gulf States*, 704 F.2d 1390, the employer objected to Board-ordered backpay for the first time in a motion for reconsideration. The Board argued that our court could not reach the issue because it was not properly exhausted under § 10(e). We disagreed, explaining the employer's failure to raise the backpay issue before its motion for reconsideration was excused because "the company had no grounds for objection until after the Board's decision." *Id.* at 1399.

So too here. It is true that in theory, Thryv could have put the issue before the Board earlier by excepting to the ALJ's finding that Thryv had an obligation to bargain. But the ALJ found Thryv's layoffs did not violate the NLRA. So the ALJ's finding that Thryv had an obligation to bargain about the layoffs at all was a subsidiary finding that had no bearing on the question of Thryv's liability. Thryv therefore had "no grounds for objection until after the Board's decision." *Ibid.*; *cf. Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 876 F.3d 119, 126 (5th Cir. 2017) ("A cross-appeal is generally not proper to challenge a subsidiary finding or conclusion when the ultimate judgment is favorable to the party cross-appealing.") (quotation omitted). That means Thryv raised the Article 30 issue before the Board at its first practical opportunity.

At a minimum, the combination of Thryv's answer and its motion for reconsideration satisfy § 10(e). To hold otherwise would license the Board to make stumbling blocks out of procedural requirements and so shield its orders from judicial review. That is not what § 10(e) is for. Rather, that provision exists to ensure the Board has "notice and an opportunity to confront objections to its rulings before it defends them in court." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551 (5th Cir. 2013). The Board obviously had notice of Thryv's Article 30 objection, both from Thryv's answer to the General Counsel's complaint and from Thryv's motion for reconsideration. So we may consider it.

b.

The Board next argues Thryv never carried its burden of showing the LBFO was lawfully implemented, which means Thryv cannot rely on the LBFO to justify its layoff decisions.

That contention is perplexing for two reasons. First, the Board's finding that Thryv failed to establish the lawfulness of the LBFO is entirely unsubstantiated. After Thryv declared an impasse with respect to the successor CBA negotiations, the Union filed an unfair labor practice alleging Thryv's declaration was premature. The NLRB's own General Counsel dismissed the Union's charge, explaining:

> [T]he evidence established that the parties met on approximately 78 days over one year and more importantly, since the Employer's August 7, 2018 last, best, and final proposal, the parties made no advances or reached any compromises on any major issues before the Employer's September 25, 2018 declaration of impasse. Hence, because the parties were at impasse and there is no evidence that continued bargaining would have been fruitful, the Employer was privileged to implement terms of its last, best and final offer and such implementation did not violate the Act.

ROA.1035. The Board argued in its proceedings that the General Counsel's "dismissal of the charge does not prove there was impasse or lawful implementation." ROA.4287. But the Board did not point to *any* evidence—let alone substantial evidence—that suggests the General Counsel was wrong to conclude the LBFO was validly implemented. So the Board's finding that Thryv failed to carry its burden of establishing the lawfulness of the LBFO must be set aside for want of evidentiary support. *See* 5 U.S.C. § 706(2)(E) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence . . . ." (quotation omitted)).

Second, Thryv maintained from the very start of the agency proceedings that the LBFO represented the lawful status quo, and the General Counsel apparently never contested the point. The Board's assertion in response to Thryv's motion for reconsideration that Thryv failed to show the LBFO was lawfully established was a bolt from the blue. Worse, the bolt appeared just when it was too late for Thryv to do anything about it. The Board's finding was thus the epitome of arbitrary—as arbitrary as a judge ruling against a party for failing to proffer evidence in support of a fact to which his counterparty stipulated.

Countenancing the Board's argument would mean the Board could use the General Counsel "capriciously . . . as the cat's paw" in "its fictional separation of powers arrangement." *United Nat'l Foods, Inc. v. NLRB*, 66 F.4th 536, 557 (5th Cir. 2023) (Oldham, J., dissenting). For example, the Board could direct the General Counsel not to contest certain facts, and then it could turn around and rule against parties on the ground that they failed to proffer evidence establishing those very facts. That is a door we decline to open. So even if the Board's finding was supported by substantial evidence, we would still set it aside as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency

No. 23-60132

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (quotation omitted)).

c.

Finally, the Board and the Union both contend Article 30 is irrelevant. In their view, even if Article 30 could have privileged Thryv to lay off the NBAs in an impasse, the parties broke their impasse (and hence obviated Article 30) before the layoffs occurred. We (i) reject the Board's argument. Then we (ii) reject the Union's argument.

i.

In the Board's view, Thryv and the Union broke their impasse by restarting CBA negotiations before the layoffs occurred. And the Board's precedent holds that employers may not make any unilateral changes while they are engaged in CBA negotiations. *See Bottom Line Enters.*, 302 N.L.R.B. at 374 ("[W]hen . . . parties are engaged in [CBA] negotiations, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole."). The Board contends the layoffs were therefore unlawful. **Red Br. at 26.**

We are not sure the *Bottom Line Enterprises* rule comports with the NLRA. But even assuming it does,[5] the Board's argument fails because Thryv correctly argues the Board failed to justify its finding that Thryv and the Union broke their impasse before making the layoffs on September 20. Blue Br. 36.

---

[5] We make this assumption because Thryv never challenged the *Bottom Line Enterprises* rule, either in the administrative proceedings or on appeal.

No. 23-60132

An impasse breaks when something "creates a new possibility of fruitful discussion." *Gulf States*, 704 F.2d at 1399. To justify finding that the impasse was broken, then, the Board needed to point to evidence suggesting something happened to create a possibility of fruitful discussion by September 20. The Board did not. It merely asserted that the ALJ "found the parties . . . were in the process of negotiating a new collective-bargaining agreement when [Thryv] implemented the unilateral layoffs on September 20." ROA.3084. But neither the Board's order nor its brief on appeal explains where the ALJ said that. *See ibid.*; Red Br. 26. And it appears to us the ALJ said no such thing.[6] The Board's order thus contains no evidentiary support for its finding that the impasse broke before the layoffs occurred. A proposition supported by no evidence obviously is not supported by substantial evidence, so the Board's finding must be set aside. *See* 5 U.S.C. § 706(2)(E) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence . . . .").

The Board resists this conclusion on two grounds, but neither is persuasive. First, the Board attempts to use this appeal as an opportunity to supply the evidentiary basis that was missing from its order. But its arguments are unavailing because *SEC v. Chenery Corporation ("Chenery II")*, 332 U.S. 194 (1947), prohibits an agency from saving its decision with post hoc justifications. "[W]e look to what the agency said, not what it might have said." *Dish Network*, 953 F.3d at 380.

_____

[6] The ALJ only directly referenced negotiations over the successor agreement once, when he explained "the parties reached agreement on the terms of a new collective-bargaining agreement, but not until November 14, 2019." ROA.3105. On several occasions the ALJ obliquely referenced general contract bargaining and comments a Union representative made about the overall impasse, but the ALJ never suggested the parties reopened CBA negotiations by September 20. *See* ROA.3110–14.

Even if we could consider the evidence the Board cited for the first time in its brief on appeal, it would not support the Board's conclusion.[7] True, the Union signaled a desire to resume CBA negotiations at some point between Thryv's impasse declaration and the time of the layoffs. But a demand to bargain does not "create[] a new possibility of *fruitful* discussion." *Gulf States*, 704 F.2d at 1399 (emphasis added). If it did, a union could undermine an employer's impasse declaration merely by asking for a meeting. Rather, our precedent requires something more substantial than a bargaining demand to break an impasse—like a strike or a meaningful concession. *See ibid.* The Union did not call a strike, and the Board does not point to anything suggesting the Union made a meaningful concession before September 20.[8] Nor does it point to any other analogously substantial change in the bargaining landscape.

Second, the Board contends the lawfulness of its application of *Bottom Line Enterprises* is beside the point. In the Board's view, Thryv failed to challenge its application of *Bottom Line Enterprises* in the administrative proceedings, so the Board once again invokes § 10(e) to shield itself from judicial review. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

---

[7] The Board's evidence shows only that the Union thought the impasse was broken. The fact that the Union thought the impasse was broken does not mean the impasse was actually broken.

[8] We assume September 20 is the relevant date for the *Bottom Line Enterprises* analysis. But it may be more accurate to say Thryv initiated the layoffs on August 21, when Thryv took the first step prescribed by Article 30. *See Comau*, 671 F.3d at 1239–40 (explaining some unilateral changes are implemented when the employer announces them, even if those changes do not take effect until a later date).

No. 23-60132

But Thryv objected in its motion for reconsideration that the Board erred by finding the layoffs unlawful under *Bottom Line Enterprises* because the parties "were at an overall impasse" on September 20. ROA.4278 (quotation omitted).[9] The Board acknowledged Thryv's objection. *See* ROA.4286 n.1 ("The Respondent implies in its motion for reconsideration that the Board erred in finding that, pursuant to *Bottom Line Enterprises*, the Respondent violated [§§] 8(a)(5) and (1) of the Act by making unilateral changes during the course of bargaining a successor agreement when the parties had not reached 'overall impasse' in bargaining for the agreement as a whole."). So Thryv's objection was obviously sufficient to "put the Board on notice that the [*Bottom Line Enterprises*] issue might be pursued on appeal." *Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981). It also gave the Board "adequate notice of the basis for [Thryv's] objection"— namely that the parties were at overall impasse when the layoffs occurred. *Nathan Katz Realty, LLC v. NLRB*, 251 F.3d 981, 985 (D.C. Cir. 2001) (quotation omitted).

Perhaps Thryv could have been more precise, but § 10(e) does not require employers to put an issue before the Board with pristine clarity. *See Gulf States*, 704 F.2d at 1399 (holding that an employer preserved an issue by ambiguously referencing the issue in a motion for reconsideration). Context made clear enough that Thryv's objection implicated the question of whether the parties broke their impasse before the layoffs. The Board proved as much because in response to Thryv's objection it explained its view that the parties had resumed CBA negotiations by September 20. ROA.4287 n.1.

---

[9] Section 10(e) does not bar us from considering Thryv's objection. That is because the Board made its no-impasse finding *sua sponte*, so Thryv's first opportunity to object to that finding was at the motion for reconsideration stage. *See supra*, at 18–19 (citing *Gulf States*, 704 F.2d at 1399).

Section 10(e) requires no more, which means Thryv adequately preserved its objection. *See Consol. Freightways*, 669 F.2d at 794 ("[W]hen the issues implicated by an imprecisely drafted objection are made evident by the context in which it is raised, [§] 10(e) does not shield the Board's resolution of those issues from review."); *see also ibid.* (collecting cases).

ii.

In the Union's view, the parties broke their impasse before the layoffs occurred for a different reason. The Union argues an employer breaks an impasse any time it fails to comply with a union's lawful information request. Thryv failed to comply with several of the Union's lawful information requests. *See infra* Part II.B. To the Union, that means Thryv broke the impasse before September 20. And since the breaking of an impasse suspends operation of an LBFO, the Union contends Thryv cannot rely on the LBFO to justify the layoffs. To support its argument, the Union looks to our decision in *Raven Services*, 315 F.3d 499.

The Union's argument fails for the simple reason that the Board never made it. That means it too runs headlong into the "simple but fundamental rule . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Dish Network*, 953 F.3d at 379–80 (quoting *Chenery II*, 332 U.S. at 196).

Moreover, *Raven Services* held only that an employer breaks an impasse on CBA negotiations by failing to provide a union with information that is "relevant *and necessary* for bargaining." 315 F.3d at 505 (emphasis added) (quotation omitted). The Board found Thryv failed to provide the Union with some information, but it is not clear any of that information was "necessary for bargaining." *See, e.g.*, ROA.3128 (ALJ holding Thryv's information-related failures did not preclude the Union from bargaining

No. 23-60132

effectively). And in any event, unlike the union in *Raven Services*, the Union in this case was not seeking information for the purpose of bargaining on a successor CBA. So it is far from obvious that the Union's position actually follows from *Raven Services*.

\*     \*     \*

In sum, Thryv's layoffs were lawful so long as Thryv and the Union remained at overall impasse on September 20. The Board failed to justify its finding that CBA negotiations had resumed by that date. The Board's and the Union's other arguments are similarly unavailing, so we vacate the Board's no-impasse finding.

## B.

Finally, the information requests. An employer's duty to bargain collectively under § 8(a)(5) of the NLRA includes the duty to supply a union with information that will allow it to "negotiate effectively and . . . perform properly its . . . duties as bargaining representative." *N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011) (quotation omitted). Employers accordingly have a "general obligation . . . to provide information that is needed by the [union] for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967). So "in the absence of a countervailing interest," any information requested by a union "that has a bearing on the bargaining process must be disclosed." *U.S. Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998).

The Board found Thryv failed to respond to six information requests lodged by the Union:

- The Union's April 12 request for information related to Thryv's Quarterly Relief program for sales representatives.

No. 23-60132

- The Union's September 11 request for an audit trail—*i.e.*, "detailed account level information" used in the industry "to determine the origins of where an account begins, who it's assigned to, and where it ultimately ends up."

- The Union's September 11 request for particularized information about the locations of the NBAs involved in the layoffs.

- The Union's eight-part October 17 request for voluminous account-related reports.

- The Union's October 30 request for information related to certain accounts that had gone through a unification process when Thryv formed out of the merger of two pre-existing Yellow Pages companies.

- The Union's October 31 request for information related to two NBAs Thryv transferred to new positions in the months before it initiated the layoffs.

Thryv does not contest the Board's findings with respect to the April 12 Quarterly Relief request, the October 30 Account Unification request, or the October 31 NBA Transfer request. So the Board is presumptively entitled to summary enforcement as to those findings. *See El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 658 (5th Cir. 2012).

Thryv does contest the Board's findings with respect to the other three information requests, but its objections are baseless.

- <u>The September 11 Audit Trail request</u>: Thryv contends it was not obligated to respond to the Union's request for an audit trail because doing so would have been unduly burdensome. But the ALJ found— based on trial testimony—that Thryv failed to object to the request at the time the Union lodged it. Thryv does not dispute that finding. And "if [a] company does wish to assert that a request for information is too burdensome, this must be done at the time the information is

requested and not for the first time during the unfair labor practice proceeding." *Oil, Chem. & Atom. Workers Loc. Union, AFL-CIO 6-418 v. NLRB*, 711 F.2d 348, 353 n.6 (D.C. Cir. 1983) (quotation omitted).

- The September 11 NBA Location request: Thryv contends it was not obligated to respond to the Union's request for NBA location information because the Union already had all the information it was asking for. But the ALJ found that it was not unreasonable for the Union to request the information to "confirm the accuracy" of its records. ROA.3121. Given the liberal relevance standards governing information requests, the ALJ's finding was not unreasonable.

- The October 17 Account Report request: Thryv contends it was not obligated to respond to the Union's eight-part request for account-related information because doing so would have been unduly burdensome, and the Union would not work with Thryv to share the cost of providing the data. But the ALJ found—based on trial testimony—Thryv failed to carry its burden of providing the Union with evidence that it would have been unduly costly to produce the information. Thryv does not dispute that finding, and it is dispositive. *Tower Books*, 273 N.L.R.B. 671, 671–72 (1984).

Thus, the Board's findings with respect to the information requests were reasonable and supported by substantial evidence. We accordingly enforce the Board's order requiring Thryv to cease and desist from "failing and refusing to furnish [the Union] with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of its employees." ROA.3093.

But we refuse enforcement of the Board's order requiring Thryv to "[f]urnish to the Union in a timely manner the information requested by the Union on April 12, September 11 and 16, and on October 3, 17, and 31, 2019." ROA.3094; *see* 29 U.S.C. § 160(e) ("[T]he court . . . shall have power . . . to

No. 23-60132

make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board."). That is because it makes little sense to require Thryv to furnish the Union with years-old information that relates mostly to employees who may never work for Thryv again. *See NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 7 (D.C. Cir. 1980) ("[A] court in its supervisory role may decline to enforce portions of a Board order that require affirmative action when that particular action has become futile at the time enforcement is sought."); *NLRB v. Greensboro News & Rec., Inc.*, 843 F.2d 795, 798 (4th Cir. 1988) (same).

\*    \*    \*

For the foregoing reasons, Thryv's petition for review is GRANTED. The Board's order is VACATED IN PART with respect to the following sections:

- Section 1: subsections (b), (c);
- Section 2: subsections (a), (b), (c), (d), (e), (f), (g), (h), (i), (j) (k).

The Board's cross-petition for enforcement is DENIED with respect to the same sections and GRANTED with respect to all other sections.